CLERK'S OFFICE
A TRUE COPY
May 08, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*
Two electronic storage devices containing records from cellular service providers AT&T and T-Mobile, in the custody of the Waukesha County Sheriff's Department

Case No. 26-MJ-74

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To: Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the Eastern District of Wisconsin *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before 05/22/2026 *(not to exceed 14 days)*

❐ in the daytime 6:00 a.m. to 10:00 p.m. ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to William E. Duffin, U.S. Magistrate Judge.
*(United States Magistrate Judge)*

❐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

❐ for ____ days *(not to exceed 30)* ❐ until, the facts justifying, the later specific date of ____________.

Date and time issued: 05/08/2026 at 9:45 a.m.

William E. Duffin [signature]
*Judge's signature*

City and state: Milwaukee, Wisconsin

William E. Duffin, U.S. Magistrate Judge
*Printed name and title*

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name(s) of any person(s) seized: | | |

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: ______________________

______________________________
*Executing officer's signature*

______________________________
*Printed name and title*

**MATTER NO. 2025R00391**

**ATTACHMENT A**

**Property to Be Searched**

1. An electronic storage device, which contains records from cellular service provider AT&T Corporation relating to call number **786-516-6535** (**AT&T Call Number 1**), marked as Property Number 331524 and stored in the Waukesha County Sheriff's Department Evidence Room, in the Eastern District of Wisconsin.

2. An electronic storage device, which contains records from cellular service provider T-Mobile US Inc. relating to International Mobile Subscriber Identifiers **310260126406195 (IMSI 1), 310260555960125 (IMSI 2)**, **310260620760105 (IMSI 3)**, and **310260423280089 (IMSI 4),** marked as Property Number 329927 and stored in the Waukesha County Sheriff's Department Evidence Room, in the Eastern District of Wisconsin.

## ATTACHMENT B

### Particular Things to be Seized

All information that constitutes evidence and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy to violate the laws of the United States), 2314 (interstate transportation of stolen goods), 2315 (sale or receipt of stolen goods, securities, or moneys), 1956 (concealment and promotion money laundering and conspiracy), and 1957 (spending money laundering), involving LEANDRO FELIPE PINO URIBE ("URIBE"), ENJERBET ALEJANDRO ROJAS SILVA ("SILVA"), LUCIANO ALEXIS SILVA CIFUENTES ("CIFUENTES"), ANDRES IGNACIO ISAAC MELITA ESPARZA ("MELITA"), and JORGE DARIO MARTINEZ ARENEDA ("ARENEDA").

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records in order to locate the things particularly described in this warrant.

CLERK'S OFFICE
A TRUE COPY
May 08, 2026
s/ MMK
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Two electronic storage devices containing records from cellular service providers AT&T and T-Mobile, in the custody of the Waukesha County Sheriff's Department

Case No. 26-MJ-74

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the Eastern District of Wisconsin, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
| --- | --- |
| 18 U.S.C. §§ 371, 2314, 2315, 1956, and 1957 | Conspiracy to violate the laws of the United States; interstate transportation of stolen goods; sale or receipt of stolen goods, and securities; and money laundering |

The application is based on these facts:

See the attached affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of ______ days *(give exact ending date if more than 30 days:* ____________ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

BRANDON AMERINE Digitally signed by BRANDON AMERINE Date: 2026.05.06 16:04:27 -05'00'

*Applicant's signature*

Brandon T. Amerine, Special Agent (FBI)

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone *(specify reliable electronic means)*.

Date: 05/08/2026

William E. Duffin

*Judge's signature*

City and state: Milwaukee, Wisconsin

William E. Duffin, U.S. Magistrate Judge

*Printed name and title*

**AFFIDAVIT IN SUPPORT OF**
**<u>AN APPLICATION FOR A SEARCH WARRANT</u>**

I, Brandon T. Amerine, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property which is currently in law enforcement possession. Specifically, this warrant seeks authority to obtain, review, and seize evidence from: (1) electronic data currently in the custody of the Waukesha County Sheriff's Department ("WCSD"), which includes historical cell site location information, historical precision location information, subscriber information, and other historical non-content records obtained from AT&T Corporation (AT&T) pertaining to the cellular telephone assigned call number **786-516-6535 ("AT&T Call Number 1")**, and (2) electronic data currently in the custody of the WCSD, which includes historical cell site location information, historical precision location information, subscriber information, and other historical non-content records obtained from T-Mobile US Inc. (T-Mobile) pertaining to the International Mobile Subscriber Identifiers: IMSI 310260126406195 **("T-Mobile IMSI 1"),** IMSI 310260555960125 **("T-Mobile IMSI 2"),** IMSI 310260620760105 **("T-Mobile IMSI 3")**, and IMSI 310260423280089 **("T-Mobile IMSI 4")**. The WCSD obtained this electronic data from AT&T and T-Mobile, the providers of cellular services to the target call number and IMSIs, pursuant to search warrants issued from the Waukesha County Circuit Court. This electronic data is currently located on storage devices in the possession of the WCSD, as detailed below and in Attachment A. The information to be seized from the contents of the storage devices is described herein and in Attachment B.

2. I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States

who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I am authorized by law or by a government agency to engage in or supervise the prevention, detention, investigation, or prosecution of a violation of federal criminal laws.

3. I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Special Agent with the Federal Bureau of Investigation ("FBI") since May 2019. I am currently assigned to the Milwaukee Field Office, Homeland Security Task Force ("HSTF"). The primary mission of the HSTF is to identify, investigate, disrupt, and dismantle transnational criminal organizations and their associates operating in communities in and around the greater area of Milwaukee. My responsibilities include the investigation of possible violations of federal law, including weapons trafficking, narcotics trafficking, human trafficking, money laundering, conspiracy to commit offenses or to defraud the United States, interstate transfer of stolen goods, the sale of said stolen goods, bank fraud, and aggravated identity theft.

4. As an FBI Special Agent, I have participated in a wide variety of federal investigations and debriefed or participated in the debriefings of defendants, informants, and witnesses. I have participated and conducted physical and electronic surveillance, analyzing telephone toll information obtained through subpoenas, analyzing information obtained through court-ordered pen registers and trap and trace intercepts, overseeing the activities of and debriefing informants, and executing arrest and search warrants including search warrants of historical cell site location information. I have also conducted federal investigations into the use of fraudulent identifications, bank fraud, money laundering, and wire fraud, as well as robberies and other

violent crimes. Based on my training and experience, I am familiar with the use of cellphones and other forms of technology to communicate, coordinate, and facilitate the commission of these crimes and to hold and store data associated with the fruits, evidence, and instrumentalities of these crimes, including location information kept on these devices.

5. The facts in this affidavit come from my participation in this investigation, personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

6. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 371 (conspiracy to violate the laws of the United States), 2314 (interstate transportation of stolen goods), 2315 (sale or receipt of stolen goods, securities, or moneys), 1956 (concealment and promotion money laundering and conspiracy), and 1957 (spending money laundering) (hereinafter the "TARGET OFFENSES"), have been committed by LEANDRO FELIP PINO URIBE ("URIBE"), ENJERBET ALEJANDRO ROJAS SILVA ("SILVA"), LUCIANO ALEXIS SILVA CIFUENTES ("CIFUENTES"), ANDRES IGNACIO ISAAC MELITA ESPARZA ("MELITA"), JORGE DARIO MARTINEZ ARENEDA ("ARENEDA"), and others known and unknown to investigators. There is also probable cause to believe that the historical precision location information described in Attachment B will constitute evidence of the criminal violations described above, and will lead to evidence of the commission of the offenses and the identification of individuals who are engaged in the commission of these offenses.

7. The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court

of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

**IDENTIFICATION OF THE PROPRTY TO BE SEARCHED**

8. The property to be searched includes the following two electronic storage devices:

a. An electronic storage device, which contains records from cellular service provider AT&T relating to the call number **786-516-6535** (**"AT&T Call Number 1"**), which is currently stored at the Waukesha County Sheriff's Department, located in the Eastern District of Wisconsin. The WCSD received the records from AT&T on or about 12/28/25, via electronic file transfer in response to a search warrant issued under Waukesha County DA Case No. 2025WK007163, attached hereto as Exhibit 1 for reference. The records were marked as Property Number 331524 and are currently stored in the WCSD Evidence Room.

b. An electronic storage device, which contains records from cellular service provider T-Mobile relating to IMSIs **310260126406195 (IMSI 1), 310260555960125 (IMSI 2)**, **310260620760105 (IMSI 3)**, and **310260423280089 (IMSI 4),** which is currently stored at the Waukesha County Sheriff's Department, located in the Eastern District of Wisconsin. The WCSD received the records from T-Mobile on or about 11/19/2025, via electronic file transfer in response to a search warrant issued under Waukesha County DA Case No. 2025WK007163, attached hereto as Exhibit 2 for reference. The records were marked as Property Number 329927 and are currently stored in the WCSD Evidence Room.

9. The applied-for warrant would authorize the review of the data on the above-identified electronic storage devices for the purpose of identifying evidence described in Attachment B.

**PROBABLE CAUSE**

10. The United States, including the Federal Bureau of Investigation ("FBI"), Homeland Security Investigations ("HSI"), and Internal Revenue Service ("IRS"), working together as part of the Milwaukee Homeland Security Task Force ("HSTF"), are jointly conducting an investigation into a South American Theft Group ("SATG") based out of Santiago, Chile with co-conspirators based in the greater Miami and Gainesville, Florida areas. The investigation involves multiple residential burglaries in the Eastern District of Wisconsin, Western District of Wisconsin, and District of Minnesota, and the interstate transportation of property stolen during those burglaries, committed by targets including but not limited to LUCIANO ALEXIS SILVA CIFUENTES ("CIFUENTES"), ENJERBET ALEJANDRO ROJAS SILVA ("SILVA"), LEANDRO FELIPE PINO URIBE ("URIBE"), ANDRES IGNACIO ISAAC MELITA ESPARZA ("MELITA"), and JORGE DARIO MARTINEZ ARENEDA ("ARENEDA"), some of whom were aliens in the United States, in 2024 and 2025.

11. As described below, the Milwaukee HSTF has identified approximately 15 different burglaries and attempted burglaries across Wisconsin, Minnesota, and Florida with an estimated loss of approximately $1 million committed by this SATG.

**Waukesha County Investigation**

12. On December 11, 2025, the Waukesha County Sheriff's Department arrested LUCIANO ALEXIS SILVA CIFUENTES ("CIFUENTES"), ENJERBET ALEJANDRO ROJAS SILVA ("SILVA"), and LEANDRO FELIPE PINO URIBE ("URIBE"), following an

investigation into a burglary that had occurred on October 17, 2025 at W2XX N3XXX[1] Lost Creek Court, Delafield, Wisconsin, in which the victims reported the loss of approximately 100 pieces of jewelry, with an estimated value of $175,000 to $200,000. The home is located at the end of a cul-de-sac bordered by woods. A rear patio glass door was broken, and items were strewn about the home. The residence was equipped with ADT motion sensors, which the homeowners were able to review. The motion sensors detected regular movement in the home between approximately 7:48 p.m. and 8:12 p.m. on October 17, 2025.

13. Case agents identified several other burglaries in the Eastern District of Wisconsin with a same or similar modus operandi in Waukesha County and Ozaukee County:

a. On September 5, 2025, a burglary occurred at a home located at N32 W294XX Mozart Road, Delafield, Wisconsin—another home at the end of a cul-de-sac bordered by woods. There a rear patio door was also broken, and several items of jewelry were taken. Some of the items of jewelry were located in a wooded path at the rear of Mozart Road.

b. On October 10, 2025, a burglary occurred at a home located at 24XX W. Range Line Terrace, Mequon, Wisconsin—another home on a cul-de-sac bordered by woods. Entry appeared to have been made through a broken window outside of a second-floor balcony. A large amount of jewelry was stolen.

c. On October 16, 2025, a burglary occurred at a home located at 101XX Hunt Club Court, Mequon, Wisconsin—another home on a cul-de-sac bordered by woods.

[1] The full addresses of the residences listed in the affidavit are known to law enforcement, but are not included in full to protect the identity and safety of the victims.

Entry appeared to have been made through a broken glass patio door. The victims reported that jewelry, cash, and silver coins had been stolen.

14. Using that information, the Waukesha County Sheriff's Department requested and obtained a warrant issued by the Waukesha County Circuit Court for tower dump and area search warrants directed to T-Mobile, AT&T, U.S. Cellular, and Verizon for the reported burglaries. On November 5, 2025, T-Mobile produced records which identified four International Mobile Subscriber Identifiers (IMSI)—310260423280089, 310260126406195, 310260555960125, and 310260620760105—in the area of Delafield during the relevant time period(s) and in the area of Mequon during the relevant time period(s). An International Mobile Subscriber Identity (IMSI) is a unique 15-digit number stored on a SIM card that identifies a subscriber on cellular networks, to enable network operators to authenticate users, manage billing, and route calls/data.

a. IMSI 310260423280089 was in the general area of Hunt Club Court in Mequon on October 16, 2025 from approximately 6:44 p.m. to 7:32 p.m. This IMSI was also in the general area of Lost Creek Court in Delafield on October 17, 2025 from approximately 8:21 p.m. to 8:22 p.m.

b. IMSI 310260126406195 was in the general area of Hunt Club Court in Mequon on October 16, 2025 from approximately 6:42 p.m. to 7:31 p.m. This IMSI was also in the general area of Lost Creek Court in Delafield on October 17, 2025 from approximately 7:56 p.m. to 8:21 p.m.

c. IMSI 310260555960125 was in the general area of Hunt Club Court in Mequon on October 16, 2025 from approximately 6:43 p.m. to 7:25 p.m. This IMSI was also in the general area of Lost Creek Court in Delafield on October 17, 2025 from approximately 7:49 p.m. to 8:21 p.m.

d. IMSI 310260620760105 was in the general area of Hunt Club Court in Mequon on October 16, 2025 from approximately 6:42 p.m. to 6:54 p.m. This IMSI was also in the general area of Lost Creek Court in Delafield on October 17, 2025 from approximately 7:30 p.m. to 8:21 p.m.

15. Based on the distance between Lost Creek Court in Delafield and North Hunt Club Court in Mequon, four IMSIs detected near the general areas of both burglaries at the relevant time periods was consistent with the unidentified suspects. The Waukesha County Circuit Court issued an additional warrant ordering T-Mobile to produce additional records associated with the IMSIs 310260423280089, 310260126406195, 310260555960125, and 310260620760105. *See* Exhibit 2.

16. On November 19, 2025, T-Mobile produced records to the Waukesha County Sheriff's Department with information for the four T-Mobile accounts based on the IMSI numbers. Those records did not include any identifying subscriber information, but did include call and text history, location data, and the International Mobile Equipment Identity (IMEI), generally a unique number assigned to the physical device, and the identification of the phone numbers associated with each IMSI. **These are the records (along with others from AT&T described further below) that I now seek authority to review, for the evidence described in Attachment B**.

17. The Waukesha County Sheriff's Department analyzed the records and identified one additional IMEI number relevant to the investigation—IMEI 356727113178329, which was associated with IMSI 310260423280089.

18. On November 25, 2025, the Waukesha County Sheriff's Department obtained a warrant issued by the Waukesha County Circuit Court requiring Apple, Inc. to produce information related to the IMEIs. On December 8, 2025, Apple provided a response with identifying and

subscriber information for Apple accounts associated with the IMEI numbers, but did not provide any stored content for the accounts.

19. IMEIs are generally 15 digits, 14 of which are the IMEI and the 15th being a checksum digit. Due to some of the IMEI's reported to the Waukesha County Sheriff's Office by T-Mobile being 16 digits, the Waukesha County Sheriff's Office was able to calculate the actual 15-digit IMEI and verified these were found elsewhere in the T-Mobile records apart from one (1). The checksum is calculated using the Luhn algorithm. This algorithm is applied to the first 14 digits of an IMEI. Beginning left to right, every second digit is doubled. If the result of doubling a digit results in a two-digit number, the two numbers should be summed to create a single digit value (i.e. 7 doubled is 14, 1+4=5). The resulting values for the first 14 digits are then summed, and the total is used to derive the checksum digit such that a complete 15-digit IMEI has a total sum dividable by ten (10). For example, if the summing of the first 14 digits results in 53, the checksum (or 15th digit) would be 7, thus making the total value 60, which is then divisible by 10.

20. By reviewing the relevant content and non-content records for the Apple iCloud accounts and phones seized during the investigation, case agents also identified the users of these phone numbers. An analysis of the records described above revealed the following about the relevant devices and accounts:

a. IMSI 310260126406195 (**"T-Mobile IMSI 1"**):

i. User: LUCIANO ALEXIS SILVA CIFUENTES

ii. Phone number: 407-528-1751

iii. IMEI: 3561407733112407

iv. IMEI: 356140773311240

1. Apple ID 22269802858, amadofrank1701@icloud.com, "Leandro Quispe."

b. IMSI 310260555960125 (**"T-Mobile IMSI 2"**):

v. User: ENJERBET ALEJANDRO ROJAS SILVA

vi. Phone number: 321-316-9186

vii. IMEI: 3515823727966106

viii. IMEI: 351582372796617

1. Apple ID 18657387614, jamesrodrigues.09@icloud.com, "James Rodriguez." The billing information for this account was listed as "Enjerbet Rojas."

c. IMSI 310260620760105 (**"T-Mobile IMSI 3"**):

ix. User: ANDRES IGNACIO ISAAC MELITA ESPARZA

x. Phone number: 321-316-9199

xi. IMEI: 3550082803027707

xii. IMEI: 355008280302773

1. Apple ID 22525379858, ignaciomelita22@icloud.com, "Ignacio Melita."

d. IMSI 310260423280089 (**"T-Mobile IMSI 4"**):

xiii. User: JORGE DARIO MARTINEZ ARENEDA

xiv. Phone number: 612-221-2511

xv. IMEI: 3567271131783243

xvi. IMEI: 3534604707087301

xvii. IMEI: 356727113178329

1. Apple ID 18898006527, saintmaxim10@icloud.com, "Saint Maxim."

21. The WCSD analyzed the location data for the above phone records which provided a general timeline of activity and travel patterns related to these devices. The location history indicated that between about September 3, 2025, and November 2, 2025, the devices routinely traveled back and forth across the United States, primarily between Florida and Wisconsin and Minnesota. Historical data was available for CIFUENTES's device assigned IMSI *6195 (**"T-Mobile IMSI 1"**) beginning on August 20, 2025, ARENEDA's device assigned IMSI *0089 (**"T-Mobile IMSI 4"**) beginning on September 4, 2025, MELITA's device assigned IMSI *0105 (**"T-Mobile IMSI 3"**) beginning on September 10, 2025, and SILVA's device assigned IMSI *0125 (**"T-Mobile IMSI 2"**) beginning on September 10, 2025.

22. On December 5, 2025, the Waukesha County Sheriff's Department obtained a pen register and trap-and-trace warrant issued by the Waukesha County Circuit Court for location information from T-Mobile for ARENEDA's phone number 612-221-2511, CIFUENTES's phone number 407-528-1751, SILVA's phone number 321-316-9186, and MELITA's phone number 321-316-9199. T-Mobile provided records which indicated that two of numbers, ARENEDA's phone number 612-221-2511 and MELITA's phone number 321-316-9199, no longer had active accounts. CIFUENTES's phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) was active and providing location data, and SILVA's phone number 321-316-9186, associated with IMSI 310260555960125 (**"T-Mobile IMSI 2"**), had recently changed its phone number, but the account was still active. The Waukesha County Sheriff's Department obtained a second pen register and trap-and-trace warrant issued by the Waukesha County Circuit Court for IMSI 310260555960125 (**"T-Mobile IMSI 2"**), which was served on December 9, 2025. T-Mobile

identified the new telephone number assigned to SILVA's IMSI 310260555960125 (**"T-Mobile IMSI 2"**) as 612-806-1110.

23. The location information for CIFUENTES's phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) showed that the devices were in Florida before returning to Wisconsin on December 3, 2025. CIFUENTES's phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's phone number 612-806-1110 (associated with **"T-Mobile IMSI 5"**) remained in Wisconsin until returning to Florida on December 7, 2025. During this timeframe, burglaries were reported in Fox Point, Wisconsin on December 4, 2025, in De Pere, Wisconsin on December 5, 2025, and, in Middleton, Wisconsin on December 6, 2025. The Waukesha County Sheriff's Department compared known locations of the suspect devices at each burglary location during the above burglary dates and times with Flock Safety traffic cameras, and identified the vehicle used by the suspects as a white Nissan Rogue SUV (Florida: FMSB90), registered to CARLOS XAVIER ORTIZ RIVERA of Casselberry, Florida. Flock records documented the white Nissan Rogue SUV (Florida: FMSB90)'s movement from Florida to Wisconsin and back to Florida, consistent with the burglary locations and locations of CIFUENTES's device assigned phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's device assigned phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**).

24. On December 10, 2025, at approximately 7:00 p.m., CIFUENTES's device assigned phone number 407-528-1751 and SILVA's device assigned phone number 612-806-1110 were traveling together as the devices left Florida on Interstate 75 heading north. At 10:19 p.m., a Flock Safety camera observed a red Dodge Durango (Florida: DW01LC) near Interstate 75 near mile marker 74 northbound in Turner County, Georgia. T-Mobile records for CIFUENTES's

device assigned phone number 407-528-1751 and SILVA's device assigned phone number 612-806-1110 placed them in the same area. A check of the vehicle's registration identified it as a 2022 Dodge Durango (VIN: 1C4RDHDGXNC101523), registered to CARLOS XAVIER ORTIZ RIVERA in Casselberry, Florida.

25. On December 11, 2025 at approximately 8:20 a.m., a Flock camera captured the Dodge Durango near Marion, Illinois, while the T-Mobile records for CIFUENTES's device assigned phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's device assigned phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) placed the devices in the same general area. At approximately 11:09 a.m., a license plate reader under the control of the Illinois State Police captured the Dodge Durango on Interstate 55-104, at the same time as the T-Mobile records placed CIFUENTES's device assigned phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's device assigned phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) on Interstate 55 near Divernon, Illinois. At approximately 2:27 p.m., an Illinois State Police camera captured the Dodge Durango on Interstate 90 at Newburg Road, Rockford, Illinois, while the T-Mobile location data placed CIFUENTES's device assigned phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's device assigned phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) on Interstate 90, also in Rockford, Illinois.

26. The Waukesha County Sheriff's Department continued to monitor the Flock Safety camera reports of the Dodge Durango, in conjunction with the T-Mobile location records, which documented both the Durango and CIFUENTES and SILVA's devices traveling together, northbound on Interstate 43 into Wisconsin. This information was relayed to patrol deputies with

Waukesha County Sheriff's Department, who were advised to stage along Interstate 43 in an attempt to locate and stop the vehicle.

27. On December 11, 2025, at approximately 4:15 p.m., the Waukesha County Sheriff's Department observed the same red Dodge Durango pass their location and conducted a traffic stop of the vehicle. The Dodge Durango had three occupants. The driver was initially identified as "LEONARDO MATEO QUISEPE GARCIA" (DOB: 01/07/1999). With the assistance of Homeland Security Investigations and Immigrations and Custom Enforcement, the driver was later determined to be LUCIANO ALEXIS SILVA CIFUENTES (DOB: 01/17/2002), a Chilean national. CIFUENTES was in possession of a blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**). The front seat passenger was identified as ENJERBET ALEJANDRO ROJAS SILVA (DOB: 04/26/2006), a Chilean national. (SILVA had previously been arrested under an alias on November 4, 2025 by the Hamilton County Sheriff's Department in Florida, as discussed below.) SILVA was in possession of a white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**). The third passenger located in the rear passenger compartment was identified as LEANDRO FELIPE PINO URIBE (DOB: 12/02/2005), a Chilean national. URIBE was found in possession of a black Apple iPhone 13 assigned call number 786-516-6535 (**"AT&T Call Number 1"**).

28. The Waukesha County Sheriff's Department subsequently requested and obtained a warrant issued by the Waukesha County Circuit Court for information associated with the call number for the device seized from URIBE, 786-516-6535 (**"AT&T Call Number 1"**). *See* Exhibit 2. AT&T produced records in response to the warrant, including subscriber information, call and text history, and location data. **These are the records (along with others from T-Mobile**

**described further above) that I now seek authority to review, for the evidence described in Attachment B.**

29. During a search of the Dodge Durango, the Waukesha County Sheriff's Department found multiple items of evidentiary value. In the passenger compartment, investigators located a black backpack containing a Dewalt Sawzall, 12 red Diablo Sawzall blades, and 26 black radio antennas consistent with those used with Wi-Fi signal jammers to disrupt Wi-Fi connections and security system equipment. Lying on the floorboard of the vehicle, the Waukesha County Sheriff's Department found two window punch devices. All of these are burglar's tools used to commit the types of burglaries described here. Investigators also found fraudulent Peruvian identifications, including an identification card and passport for "JOSE MARTIN MARTEL MONTOYA," with a picture of URIBE and another fraudulent Ecuadorian identification for "CARLOS ENRIQUE CEDEMOS PERDOMO," with a picture of ROJAS SILVA. A fourth cell phone, a black Samsung Galaxy A16 assigned call number 110028195695608, was also located in the rear passenger compartment.

30. All three subjects were identified by HSI and ICE as being in the country illegally and were transported to the Waukesha County Jail for booking and interviews. Immigration holds were also placed on the three subjects.

31. Based on a review of the Wisconsin Circuit Court Access records, URIBE was charged with possession of burglarious tools, in violation of Wisconsin Statutes 943.12 and 939.05, in Waukesha County Case Number 2025CF002081. SILVA was charged with burglary of a building or dwelling, in violation of Wisconsin Statutes 943.10(1m)(a) and 939.05, and possession of burglarious tools, in violation of Wisconsin Statutes 943.12 and 939.05, in Waukesha County Case Number 2025CF002082. CIFUENTES was charged with burglary of a building or dwelling,

in violation of Wisconsin Statutes 943.10(1m)(a) and 939.05, and possession of burglarious tools, in violation of Wisconsin Statutes 943.12 and 939.05, in Waukesha County Case Number 2025CF002083. On April 13, 2026, URIBE pled guilty to possession of burglarious tools, in violation of Wisconsin Statutes 943.12 and 939.05, and sentenced to time served. URIBE was then charged by federal criminal complaint in Case No. 26-882 in the United States District Court for the Eastern District of Wisconsin with violations of 18 U.S.C. §§ 371, 2314, and 2315. CIFUENTES and SILVA are scheduled for plea and sentencing in Waukesha County Circuit Court on May 13, 2026.

**Expanded Investigation**

32. On or about January 30, 2026, the Honorable Nancy Joseph, United States Magistrate Judge of the Eastern District of Wisconsin, issued a warrant under Case No. 26-859M to search the four devices found during the arrest of URIBE, CIFUENTES, and SILVA and the search of the Dodge Durango on December 11, 2025. A summary of the identifiers for those four phones is listed below:

a. CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**), listed the name "Frank Luciano" and email address amadofrank1701@icloud.com, IMEI 1: 356140773311240, IMEI 2: 356140772568949, Serial Number – FKFWFG79P7, and UDID: 00008140-001c23d002f2801c, was found in the possession of CIFUENTES.

b. SILVA's white apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**), which previously had call number 321-316-9186, listed the name "James Rodriguez" and email address jamesrodrigues.09@icloud.com, IMEI 1: 351582372796617, IMEI 2:

351582372963415, Serial Number – JLHHWM9GWM, and UDID: 00008140-000919d134eb001c, was found in the possession of SILVA.

c. URIBE's black apple iPhone 13 assigned call number 786-516-6535 (**"AT&T Call Number 1"**), listed the name "Leandro Uribe" and email address leandrovt23@icloud.com, IMEI 1: 354835954781499, IMEI 2: 354835954802071, Serial Number – M92LQ2YJ22, UDID: 00008110-0019543136EB601E, found in the possession of URIBE.

d. The black Samsung Galaxy A16 assigned call number 110028195695608, containing email address acertijoperseverante@gmail.com, IMEI: 353751681172541, and IMSI: 310410462892231, owner yet to be determined, was found in the rear passenger compartment of the vehicle.

33. In reviewing these devices, case agents have tied this South American Theft Group with approximately 15 burglaries or attempted burglaries, involving CIFUENTES, SILVA, URIBE, ARENEDA, and MELITA, either collectively or individually. In summary, the investigation has shown that these co-conspirators rented Airbnb short-term rental properties in Florida, Wisconsin, and Minnesota, which were facilitated by Nobuaki Jesus LARA WATAY (DOB: 12/13/1994), a Venezuelan national living in Gainesville, Florida, and which allowed CIFUENTES, SILVA, URIBE, ARENEDA, and MELITA to conduct the burglaries and attempted burglaries in Wisconsin, Minnesota, and elsewhere. A summary and timeline of relevant incidents is provided below.

34. More specifically, a review of CIFUENTES' blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) revealed numerous WhatsApp conversations between CIFUENTES and WATAY about Airbnb rentals. These conversations

were conducted on WhatsApp utilizing CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and WATAY using both the WhatsApp messenger account linked to call number 561-451-5293 with corresponding name "Nobuaki Watay" (WATAY's WhatsApp -5293), and WhatsApp messenger account "TheBigMann" (78066047004848@lid), with telephone number 352-657-5918 ("TheBigMann account").

35. On February 23, 2026, T-Mobile produced information for WATAY's phone number 561-451-5293. According to T-Mobile's records, the service start date for the device was September 19, 2022, with subscriber listed as "Hector Guzman" with service address of 5077 NW 7th, Apartment 1702, Miami, Florida 33126. According to toll records, WATAY's 561-451-5293 phone number did not have message or call communications with CIFUENTES's phone number 407-528-1751 between April 1, 2025 and February 23, 2026.

June 29, 2025 – Burglary of 1XX N. Fig Tree Lane, Plantation, Florida

36. On or about June 29, 2025, a residence at 1XX North Fig Tree Lane, Plantation, Florida was burglarized, and a safe was broken into. The victim reported that approximately $25,000 worth of silver and 70 ounces of gold worth approximately $200,000 was stolen from his safe.

37. A review of CIFUENTES' blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) revealed numerous photos on the device around the time of the burglary at 1XX N. Fig Tree Lane, Plantation, Florida, some of which include:

a. Photo of a white Heritage safe taken on June 29, 2025 at approximately 11:10 p.m., as seen below. During an interview with the victims on April 7, 2025, the victim confirmed the safe in the picture above was theirs.




b. Photos of CIFUENTES and MELITA together in a vehicle taken on June 29, 2025 at approximately 11:24 p.m. and again at 11:53 p.m., as seen below:



c. A photo of CIFUENTES holding a box of gold standing next to a table with gold and silver on it, taken on June 30, 2025 at approximately 1:50 a.m., as seen below. During an interview with the victims on April 7, 2026, they confirmed the items depicted in the picture were consistent with the items they owned.



38. A review of SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed videos and photos relating to the burglary at 1XX N. Fig Tree Lane, Plantation, Florida, some of which include:

a. A video depicting silver coins, gold coins, gold bars, jewelry, and a gold-colored metal mesh purse laid out on a table, taken on June 30, 2025 at approximately 12:28 a.m., screenshots from video seen below. During an interview with the victims on April 7, 2026, they confirmed that many of the gold and silver bullion resembled the ones stolen from their safe and confirmed that the gold mesh bag on the table was theirs.



b. A picture of SILVA holding what appears to be the same box of gold as CIFUENTES was pictured holding, taken on June 30, 2025 at approximately 1:45 a.m., as seen below:



c. A picture of SILVA holding a gold-colored purse, taken on June 30, 2025 at approximately 9:10 a.m. with GPS metadata of 25.858022, -80.228875,

which corresponds with 1850 NW 92nd Street, Miami, Florida 33147, as seen below. During an interview with the victims on April 7, 2026, the victims confirmed the gold mesh bag in SILVA's hand belonged to them.



d. A video of gold coins and bars stacked and organized on a table near a weight scale, taken on June 30, 2025 at approximately 9:13 a.m., screenshot from video seen below:



e. A picture of CIFUENTES and SILVA together where CIFUENTES is seen holding a stack of cash, taken on July 1, 2025 at approximately 5:38 p.m. with GPS metadata of 25.858022, -80.228981, which corresponds with 1850 NW 92nd Street, Miami, Florida 33147, as seen below:



f. CIFUENTES, SILVA, and MELITA together in a kitchen, taken on July 4, 2025 at approximately 1:52 a.m. with GPS metadata of 25.957041, -

80.256500 which corresponds with 20126 NW 32nd Place, Miami Gardens, Florida 33056, as seen below:



39. Records provided by Airbnb show that 20126 NW 32nd Place, Miami Gardens, Florida 33056 was rented by Guest ID 308873178, which Airbnb identified as corresponding with subscriber information for "Nobuaki Watay" listing nobuakiw13@hotmail.com and 1-561-451-5293, with a start date of July 3, 2025 for seven nights and three guests.

**September 2, 2025-September 8, 2025: Minnesota Trip**

40. Historical location information from T-Mobile shows that CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")** traveled from Florida to Minnesota on or about September 3, 2025, and that ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** was also in the greater Minneapolis area as of September 4, 2025. During this time period, a burglary was committed at 19XX Glenhill Road, Mendota Heights, Minnesota 55118 on September 6, 2025.

41. Between August 20, 2025 and September 2, 2025, CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")** was in Florida until September 2, 2025 before arriving in Minnesota on September 3, 2025. On September 4, 2025, ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** appeared in Minnesota. CIFUENTES's device assigned IMSI *6195 and ARENEDA's device assigned IMSI *0089 left Minnesota on September 7, 2025, and arrived in Florida on September 8, 2025, consistent with traveling together and by automobile.

42. As discussed above, T-Mobile only provided historical location information for MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")** and SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")** beginning September 10, 2025—after this trip to Minnesota. However, those records show that MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")** and SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")** were also in Florida on September 10, 2025, at the same time as CIFUENTES's device assigned IMSI *6195 **("T-Mobile IMSI 1")** and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** were there, shortly after this trip, in the same general area and location of CIFUENTES's device assigned IMSI *6195 **("T-Mobile IMSI 1")** and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")**.

<u>September 6, 2025 – Burglary of 19XX Glenhill Road, Mendota Heights, Minnesota 55118</u>

43. On or about September 6, 2025 between approximately 5:30 p.m. and 8:55 p.m., a residence at 19XX Glenhill Road, Mendota Heights, Minnesota 55118 was burglarized. The victims reported to the Mendota Heights Police Department that suspects had smashed a patio door to gain entry into the house and pointed out footprints, which they believed belonged to the suspects. The victims initially reported a suspected loss of approximately $5,000 to $10,000, but needed to conduct an accounting of missing items. After doing so, the victims reported a total estimated loss of $38,653.72, consisting of various jewelry, valued at approximately $37,379.29 and a U.S. coin collection, valued at approximately $1,274.43.

44. A review of SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed videos and photos relating to the burglary at 19XX Glenhill Road, Mendota Heights, Minnesota 55118, some of which are described below:

a. A video taken of a home with GPS location data of 44.887600, -93.152100, which corresponds to the vicinity of 18XX Hunter Lane, Mendota Heights, Minnesota, taken on September 6, 2025 at approximately 5:32 p.m.

b. A photo of SILVA taking a selfie in the mirror, taken on September 7, 2025 at approximately 9:45 p.m. with GPS location data of 28.303950, -81.648903, which corresponds to 1543 Carey Palm Circle, Kissimmee, Florida 34747.

c. A photo of SILVA and MELITA, both wearing various gold necklaces and bracelets, taken on September 7, 2025 at approximately 10:53 p.m., as seen below. During an interview on March 11, 2026, the victims confirmed that the bracelets worn by SILVA, as well as the rectangle necklace and longest chain worn by MELITA, belonged to them.



45. On March 23, 2026, officers of the Mendota Heights Police Department provided case agents with a photo of ARENEDA holding a clear plastic Ziploc bag containing various

jewelry as well as other photos containing various jewelry spread out on the table, obtained from a state warrant issued to Apple for iCloud account records for saintmaxim10@icloud.com. The victims from the burglary at 19XX Glenhill Road, Mendota Heights, Minnesota 55118 had identified multiple items from the photos on the table as having been stolen from them.



46. Records provided by Airbnb show that 1550 7th Street West, St. Paul, Minnesota was rented by WATAY's Airbnb account using phone number 561-451-5293, with a start date of September 3, 2025 for 4 nights and 3 guests.

47. Records provided by Airbnb show that 1543 Carey Palm Circle, Kissimmee, Florida 34747 was rented by WATAY's Airbnb account using phone number 561-451-5293, with a start date of August 11, 2025 for 31 nights and 3 guests.

**Text Messages Between CIFUENTES and WATAY**

48. On or about September 10, 2025, CIFUENTES' blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and 561-451-5293 "Nobuaki Watay" exchanged text messages. CIFUENTES writes "Dimelo," which can be translated to: "What's up?" WATAY responded: "No llega en iMessage. No tienes el iCloud activo ?" which can be translated to: "It's not coming through on iMessage. Don't you have iCloud active?" CIFUENTES responded: "Si obvio. Esque te escribí por mensaje de texto." which can be translated to "Yeah, obviously. It's just that I sent you a text message. I thought it was that." WATAY responded: "iMessage." CIFUENTES said: "Eliminó de "iMessage. No hmno. Busco y me sale

así. Nomas." which can be translated to: "He deleted it from iMessage. No, brother. I search, and that's how it comes up. That's all." WATAY writes: "Hermano anda a ajustes mensajes y ve si te aparece iMessage," which can translate to: "Bro, go to Settings > Messages and see if iMessage appears." CIFUENTES responded: "Ya ahora. Lo habilite," which can be translated to: "Okay, just now. I've enabled it." WATAY responded: "Hermano si," which can be translated to "Brother, yes." CIFUENTES then goes on: "Con el número y el iCloud. Ahora si??," which can be translated to: "With the number and iCloud. Is that it now?" WATAY then writes: "Airbnb." CIFUENTES responds: "Hermano eso me pide. Social. Yo no tengo," which can be translated to: "Brother, that's what it's asking me for—Social Security. I don't have one." WATAY responds: "Oh fuck, no sabia. Antes no era así," which can be translated to: "Oh fuck, I didn't know. It wasn't like this before." This excerpt of the conversation ends with CIFUENTS writing: "Dame un momento," which can be translated to: "Give me a minute." In these messages, CIFUENTES indicates that he does not have a social security number, and discusses the booking of an Airbnb with WATAY.

**September 16, 2025-September 22, 2025: Wisconsin Trip**

49. Historical location information from T-Mobile shows that from September 16, 2025 to September 22, 2025, CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")**, SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")**, MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")**, and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** traveled from Florida to Wisconsin, leaving Florida on September 16, 2025. On September 17, 2025, all four devices arrived in Wisconsin, before leaving on September 21, 2025, and arriving in Florida on September 22, 2025. The travel pattern is consistent with all four devices traveling together in an automobile. Case agents have not yet identified any burglaries during this time period in Wisconsin.

**September 28, 2025-October 28, 2025: Airbnb in Kissimmee, Florida**

50. On September 28, 2025 at approximately 3:07 p.m., CIFUENTES sent WATAY's WhatsApp -5293 a link to an Airbnb in Kissimmee, Florida and said: "Ese mi Hermano," which translates to "This one brother." WATAY's WhatsApp -5293 responded with "Ok, Hermano," which translates to "Ok, brother." WATAY's WhatsApp -5293 later sent CIFUENTES a screenshot of an Airbnb booking confirmation for a "Townhouse in Kissimmee" from September 28, 2025 to October 8, 2025 costing $962.10. WATAY using WATAY's WhatsApp -5293 sent CIFUENTES a "Thank You" message and instructions from Airbnb for 4707 Hemingway House Street, Kissimmee, Florida 34746. The message was addressed, "Hi, Nobuaki, Thank you so much for booking with us! . . ."

51. Records provided by Airbnb show that 4707 Hemingway House Street, Kissimmee, Florida was rented by Guest ID 308873178, which Airbnb identified as corresponding with subscriber information for "Nobuaki Watay" listing nobuakiw13@hotmail.com and 1-561-451-5293, with a start date of September 28, 2025 for 37 nights and 4 guests.

52. Records from CIFUENTES's PNC Bank account under CIFUENTES's alias LEONARDO M. QUISPE GARCIA show that CIFUENTES sent a $950 payment to "Nobuaki Watay" via Zelle on September 29, 2025. Later on September 29, 2025 at approximately 7:33 p.m., WATAY via WATAY's WhatsApp -5293 sent his address to CIFUENTES as "1015 nw 21st ave Gainesville fl 32609." Based on public records checks for Florida businesses, I know that this address is linked to WATAY and WATAY's business WL Express Services, LLC.

53. On September 29, 2025, CIFUENTES messaged WATAY via WATAY's WhatsApp -5293 and asked for marijuana and to extend the Airbnb from October 8, 2025 to October 28, 2025. WATAY responded that the cost would be $2,085 which included the

marijuana, the $100 CIFUENTES already owed him, and the Airbnb extension. CIFUENTES counteroffered for $2,000, and then WATAY and CIFUENTES agreed to everything for $2,050.

**October 7, 2025-October 13, 2025: Minnesota Trip**

54. Historical location information from T-Mobile shows that CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")**, SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")**, MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")**, and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** all left Florida on October 7, 2025, arriving in Minnesota on October 8, 2025. On October 12, 2025, all four devices left Minnesota arriving in Florida on October 13, 2025. The travel pattern is consistent with all four devices traveling together in an automobile. During this time period, a burglary was committed at 50XX Interlachen Bluff, Edina, Minnesota on October 10, 2025.

October 10, 2025 – Burglary at 50XX Interlachen Bluff, Edina, Minnesota

55. On October 10, 2025 at 9:10 p.m., the Edina Police Department responded to a report of a burglary at 50XX Interlachen Bluff, Edina, Minnesota. Officers arrived on scene and observed that the glass sliding door to the rear deck of the home had been shattered. The front door was unlocked. All other exterior doors were locked. The Edina Police Department cleared and secured the home, but did not locate a suspect. The victims stated that nothing of value had been taken from the bathroom, but both closets for the primary bedroom located inside of the bathroom had been rifled through. Officers of the Edina Police Department observed clothes thrown on the floor along with jewelry boxes and drawers open. The female victim said that all of her jewelry had been taken from the closets and was able to provide documents and photos for various pieces of jewelry, including a 14 karat white gold and diamond tennis bracelet and a 14 karat white gold and diamond drop necklace, valued at $3,999.99.

56. The victims reported that multiple items were missing from the office, valued at approximately $6,708.99, including the following: a Gold 1847 watch with no band valued at $300 to $400; $1,000 in in 50 dollar and 20 dollar bills; approximately 600 Euros in 50 and 20 Euro bills; social security cards for all four members of the family; Wells Fargo checkbooks for both homeowners; 11 collectible gold coins; a copper medal from the Royal Family of Belgium from the Royal Academy of Medicine with the face of King Leopold; two Tiffany pens valued at $200 to $300 each; and an unknown amount of Cartier pens and pencils valued at $200 to $300 each.

57. A review of CIFUENTES' blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) revealed WhatsApp conversations between CIFUENTES and WATAY about booking a rental in this area of Minnesota during the time period of the burglary. On October 7, 2025, CIFUENTES and WATAY communicated via WATAY's WhatsApp -5293 about booking an Airbnb located at 389 Charles Avenue, St. Paul, Minnesota. Later that day at approximately 6:12 p.m., CIFUENTES sent WATAY a picture containing an Ecuadorian identification with CIFUENTES's picture but with the name "ENGEL ESTEBAN LOPEZ ZAMBRANO" and a date of birth of April 18, 2000. Screenshots of two separate Zelle payments to "NOBUAKI WATAY" at nobuakiwatay05@gmail.com were found on CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**)—one for $20 and one for $180. Records for Zelle confirm that these payments were made to WATAY via CIFUENTES's PNC Bank account under the name LEONARDO QUISPE GARCIA. WATAY then sent a message to CIFUENTES on October 7, 2025 at approximately 8:40 p.m. containing the address: "389 Charles Avenue, Saint Paul, Minnesota 55103, United States." The Airbnb at 389 Charles Avenue, Saint Paul, Minnesota 55103 is approximately a 27-minute drive from 50XX Interlachen Bluff, Edina, Minnesota.

58. Records provided by Airbnb show that 389 Charles Avenue, St. Paul, Minnesota 55103, was rented by Guest ID 43296121 ("Cure's Airbnb account"), under name "Rafael Cure", rafaelcure@yahoo.com, 1-786-720-9443, with a start date of October 8, 2025 for 4 nights and 3 guests. In later conversations with CIFUENTES, WATAY references having "Rafael" book Airbnbs.

59. A review of CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed records and information relating to the burglary at 50XX Interlachen Bluff, Edina, Minnesota, some of which is described below:

a. Location data from CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) showed the following:

i. On October 9, 2025, the device was located at or around 44.957794, -93.116620, in the vicinity of 389 Charles Avenue, St. Paul, Minnesota, the same location for the Airbnb booked by WATAY, at approximately 3:29 p.m. and was located at or around 44.957686, -93.116578, in the vicinity of 389 Charles Avenue, St. Paul, Minnesota, at approximately 8:29 p.m.

ii. On October 10, 2025, the device was located at or around - 44.957725, -93.116633, in the vicinity of 389 Charles Avenue, St. Paul, Minnesota, at approximately 10:26 a.m.; at or around -44.911683, -93.365606, the woods directly behind 50XX Interlachen Bluff, at approximately 12:10 p.m.; at or around -44.957728, -93.116613, in the vicinity of 389 Charles

Avenue, St. Paul, Minnesota, at approximately 6:26 p.m.; at or around -44.909467, -93.367266, the end of the Doncaster Way parking lot in the vicinity of the trailhead to Highlands Park and 50XX Interlachen Bluff, between 7:13 p.m. to 7:50 p.m., with the burglary at 50XX Interlachen Bluff, Edina, Minnesota reportedly occurring between 6:30 p.m. and 9:10 p.m.; at or around -44.957791, -93.116645, in the vicinity of 389 Charles Avenue, St. Paul, Minnesota, at approximately 8:22 p.m.

b. Photographs and video recovered from CIFUENTES' blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) from October 10, 2025 showed the following:

   i. At 6:45 p.m., CIFUENTES and MELITA were depicted together in car, as seen below:



   ii. At 7:15 p.m., Apple Maps screenshot of area surrounding Interlachen Bluff.

   iii. At 9:17 p.m., a photo depicting a hand holding a gold-colored jewelry box with various jewelry and boxes on the table around it, as seen below. During an interview on March 11, 2026, the victim confirmed that many of the items within the photo were theirs,

specifically the gold-colored jewelry box with red jewels at the center of the photo.



c. Photographs and video recovered from SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) between October 8, 2025 and October 13, 2025, showed the following:

i. On October 10, 2025 at approximately 8:50 p.m. with GPS coordinate metadata of -44.957800, -93.116600, which corresponds with 389 Charles Avenue, St. Paul, Minnesota, a video of a hand wearing various jewelry including rings, a diamond bracelet, and gold-colored bracelet, and a video showing a table with jewelry boxes, various jewelry, gold pendant, a pocket watch, a silver colored pen, and a small digital scale, as seen below. During an interview on March 11, 2026, the victim confirmed that many of the items within the photo were theirs, specifically the gold-colored jewelry box in the photo, the perfume, the Cartier branded pens, and the jewelry on the table.



ii. On October 13, 2025 at approximately 4:49 p.m. with GPS coordinate metadata of -28.425600, -81.462400, a video taken in the vicinity of International Drive and Hawaiian Court in Williamsburg, Florida.

**October 14, 2025-October 19, 2025: Wisconsin Trip**

60. Historical location information from T-Mobile shows that from October 14, 2025, to October 19, 2025, CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")**, SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")**, MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")**, and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** traveled from Florida to Wisconsin. On October 14, 2025, all four devices left Florida, arriving in Wisconsin on October 15, 2025. During this time period, a burglary was committed at 101XX N. Hunt Club Court, Mequon, Wisconsin on October 16, 2025, and at W2XX N32XX Lost Creek Court, Delafield, Wisconsin on October 17, 2025. On October 18, 2025, the four devices left Wisconsin arriving in Florida on October 19, 2025. The travel pattern is consistent with all four devices traveling together in an automobile.

61. Records provided by Airbnb show that 2028 East Newport Avenue, Milwaukee, Wisconsin, was rented by Guest ID 43296121, under name "Rafael Cure," rafaelcure@yahoo.com, 1-786-720-9443, with a start date of October 15, 2025, for 4 nights and 3 guests.

<u>October 16, 2025 – Burglary of 101XX N. Hunt Club Court, Mequon, Wisconsin</u>

62. On October 16, 2025, at approximately 9:10 p.m., the Mequon Police Department responded to a report of a burglary at 101XX N. Hunt Club Court, Mequon, Wisconsin. The victim reported that inside their safe, which was burglarized, was approximately $1,000 in U.S. currency in various denominations, a fake Rolex watch, and documents for their home and vehicles. The

victim identified the following items as stolen from their home, valued at approximately $5,550.00: a pair of 1 carat gold earrings (with an approximate value of $2,000); 25 silver quarters (with an approximate value of $300); 25 silver dimes (with an approximate value of $200); 25 silver half dollar coins (with an approximate value of $1,000); U.S. currency estimated at $1,000 in total; various necklaces (with an approximate value of $1,000); and a fake Louis Vuitton Purse with gold-colored chain strap (with an approximate value of $50).

63. A review of CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) revealed the following relating to the burglary at 101XX North Hunt Club Court:

a. Location data from CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) showed the following:

i. On October 14, 2025, the device was located at or around 28.479767, -81.441267, outside 4900 Northbridge Drive, Orlando, Florida, at approximately 3:50 p.m., and at or around 30.002558, -82.598181, Loves Travel, 13700 U.S. 441, Lake City, Florida at approximately 8:05 p.m.

ii. On October 15, 2025, the device was located at or around 33.712127, -84.271920, Shell Gas, 2701 Candler Road, Decatur, Georgia at approximately 12:46 a.m.; at or around 43.079572, -87.884505, 2028 East Newport Avenue, Milwaukee, Wisconsin at approximately 8:02 p.m.; at or around 43.083912, -87.891564, in the vicinity of Hubbard Park in Shorewood, Wisconsin at approximately 8:32 p.m.; at or around 43.079572, -87.884505, 2028 East Newport Avenue, Milwaukee, Wisconsin at approximately 10:02 p.m.

iii. On October 16, 2025, the device was located at or around 43.079572, -87.884505, 2028 East Newport Avenue, Milwaukee, Wisconsin at approximately 9:02 a.m.; at or around 43.204365, -88.036363, Lemke Park, northwest of 101XX N. Hunt Club Court between approximately 6:47 p.m. and 7:32 p.m.;[2] at or around 43.079376, -87.884120, back to area of 2028 East Newport Avenue, Milwaukee, Wisconsin at approximately 8:04 p.m.

b. Web search data from CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) related to the burglary at 101XX N. Hunt Club Court shows the following:

i. A Google Pin drop at 101XX N. Hunt Club Court, Mequon, Wisconsin on October 15, 2025 at approximately 10:37 p.m.

c. Photos discovered from CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) related to the burglary at 101XX N. Hunt Club Court included the following:

i. A picture of a Rolex watch held in a hand, taken on October 16, 2025, at approximately 10:22 p.m., as seen below. During an interview on March 9, 2026, the victim confirmed that the Rolex watch in this photo was theirs.



[2] Lemke Park can be accessed by walking through the wooded area behind 101XX North Hunt Club Court.

64. A review of SILVA's device assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**), revealed the following related to the burglary of 101XX N. Hunt Club Court, Mequon, Wisconsin:

a. Photos and videos recovered from SILVA's device:

i. On October 16, 2025 at approximately 10:17 p.m., a video of a Rolex watch was taken with GPS metadata of 43.079500, -87.884401, which corresponds with 2028 East Newport Avenue, Milwaukee, Wisconsin. A screenshot from the video can be seen below. During an interview on March 9, 2026, the victim confirmed that the Rolex watch in this photo was theirs.



<u>October 17, 2025 – Burglary of W2XX N32XX Lost Creek Court, Delafield, Wisconsin</u>

65. As described above, on October 17, 2025, at approximately 9:00 p.m., the Waukesha County Sheriff's Department responded to a report of a burglary at W2XX N3XXX Lost Creek Court, Delafield, Wisconsin, in which the victims reported the loss of approximately 100 pieces of jewelry, with an estimated value of $175,000 to $200,000. The home is located at the end of a cul-de-sac bordered by woods. A rear patio glass door was broken, and items were strewn about the home. The residence was equipped with ADT motion sensors, which the homeowners were able to review. The motion sensors detected regular movement in the home between approximately 7:48 p.m. and 8:12 p.m. One of the victims determined that their Sentry safe, which was in a bedroom closet at the time of the burglary, had been broken into. The victims made an initial determination of the items stolen from their home which included the following:

government savings bonds with estimated value of $1,200; several silver and older coins with an approximate value of $500; and, various stolen jewelry with an undetermined value. The victims later provided an updated estimate of the jewelry stolen from their home of between $175,000 and $200,000.

66. A review of CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) revealed the following relating to the burglary at W2XX N32XX Lost Creek Court.

a. Location data from CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) showed the following:

   i. On October 17, 2025, CIFUENTES' device was located at or around 43.078888, -87.883692, in the area of 2028 East Newport Avenue, Milwaukee, Wisconsin at approximately 9:01 a.m.; at or around 43.079402, -88.322064 W2XX N32XX Lost Creek Court, Delafield, Wisconsin between approximately 7:00 p.m. and 8:20 p.m.; at or around 43.079599, -87.884442, 2028 East Newport Avenue, Milwaukee, Wisconsin at approximately 9:07 p.m.

   ii. On October 19, 2025, CIFUENTES' device was located at or around 28.276023, -81.469422, near 4711 Hemingway House Street, Kissimmee, Florida at approximately 7:59 p.m.

67. Records provided by Airbnb show that 4707 Hemingway House Street, Kissimmee, Florida was rented by Guest ID 308873178, which Airbnb identified as corresponding with subscriber information for "Nobuaki Watay" listing nobuakiw13@hotmail.com and 1-561-451-5293, with a start date of September 28, 2025 for 37 nights and 4 guests.

68. A review of SILVA's device assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed the following related to the burglary of W2XX N32XX Lost Creek Court:

a. Photos and videos from SILVA's device assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) related to the burglary of W2XX N32XX Lost Creek Court include the following:

i. On October 17, 2025 at approximately 9:41 p.m., SILVA's device contained a photo of various jewelry, jewelry boxes, and other items laid out on a bed, as seen below. During an interview on March 9, 2026, the victim from the burglary of 101XX N. Hunt Club Court, Mequon, Wisconsin on October 16, 2025 confirmed that there was a Kendra Scott branded necklace on the bed that belonged to their daughter.



ii. On October 19, 2025, between approximately 9:50 p.m. and 10:10 p.m., multiple photos with GPS metadata at or around 28.276177, -81.469309, 4707 Hemingway House Street, Kissimmee, Florida, were recovered depicting SILVA taking selfies while wearing various jewelry, as seen below. During an interview on March 9, 2026, the victim from the burglary of 101XX N. Hunt Club Court, Mequon, Wisconsin on October 16, 2025 confirmed that the watch was theirs and the ruby bracelet and matching ruby ring were their daughter's.



iii. As described above, the records provided by Airbnb show that 4707 Hemingway House Street, Kissimmee, Florida 34746 was rented using WATAY's Airbnb account, with a start date of September 28, 2025, for 37 nights and 4 guests.

**October 22, 2025-October 28, 2025: Minnesota Trip**

69. Historical location information from T-Mobile shows that between October 22, 2025, and October 28, 2025, CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")**, SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")**, MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")**, and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** traveled from Florida to Minnesota. On October 22, 2025, all four devices left Florida, arriving in Minnesota on October 23, 2025. During this time period, a burglary occurred at 12XX Culligan Lane, Mendota Heights, Minnesota on October 25, 2025. On October 27, 2025, all four devices left Minnesota, arriving in Florida, on October 28, 2025. The travel pattern is consistent with all four devices traveling together in an automobile.

70. Records provided by Airbnb show that 412 W 32nd Street, Minneapolis, Minnesota, was rented by Guest ID 43296121, under name "Rafael Cure," rafaelcure@yahoo.com, 1-786-720-9443, with a start date of October 23, 2025 for 3 nights and 3 guests.

October 25, 2025 – Burglary at 12XX Culligan Lane, Mendota Heights, Minnesota

71. On October 25, 2025, at approximately 8:43 p.m., the Mendota Heights Police Department was dispatched to a burglary in progress call at 12XX Culligan Lane, Mendota Heights, Minnesota. One of the victims reported that they were asleep in the second-level bedroom and saw lights moving on the other side of her door and thought it was their spouse who slept in a bedroom on the third floor. That victim then heard the door break open which caused them to scream which startled the suspect, and the victim described seeing two smaller statured people wearing black ski masks and dark colored clothing. The victim screamed at his/her spouse to call the police and then saw one of the suspects leave out of the north side living room window. The victims and officers determined that the following items were taken from the home with a total estimated value of $400: a small, yellow colored metal Seiko clock with "Karen Winter" engraved (with an estimated value of $400); and, a 50-year-old brooch that was yellow, pendulum, fish shaped (with an unknown estimated value).

72. A review of CIFUENTES' and SILVA's cellular devices showed the following related to the burglary of 12XX Culligan Lane, Mendota Heights, Minnesota:

a. Location data recovered from CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) from October 22, 2025 until October 25, 2025, include the following:

   i. On October 22, 2025, CIFUENTES' device was located at or around 28.276071, -81.469381, 4707 Hemingway House Street, Kissimmee, Florida at approximately 1:19 p.m.

   ii. On October 23, 2025, the device was located at or around 44.944964, -93.284943, near 412 West 32nd Street, Minneapolis, Minnesota at approximately 7:07 p.m.;

at or around 44.970222, -93.020720, Hazel Park Recreation Center, 945 Hazel Street North, St. Paul, Minnesota 55119 at approximately 8:06 p.m.; at or around 44.944920, -93.285007, back to 412 West 32nd Street, Minneapolis, Minnesota at approximately 8:39 p.m.

iii. On October 25, 2025, CIFUENTES' device was located at or around 44.944905, -93.285070, 412 West 32nd Street, Minneapolis, Minnesota at approximately 9:13 a.m.; at or around 44.888010, -93.156029, approximately 150 feet west of 12XX Culligan Lane, Mendota Heights, Minnesota at approximately 8:22 p.m.; at or around 44.944919, -93.285096, back to 412 West 32nd Street, Minneapolis, Minnesota at approximately 9:09 p.m.;

b. Photos discovered on CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) that relate to the burglary at 12XX Culligan Lane, Mendota Heights, Minnesota include the following:

i. Screenshot of a $300 Zelle payment to "NOBUAKI WATAY," with email address nobuakiwatay05@gmail.com, confirmation number PNCAA0VRI39n, taken on October 23, 2025 at approximately 10:23 p.m. (CIFUENTES's PNC bank account records under his alias LEONARDO QUISPE GARCIA confirm that Zelle payment was sent to WATAY.)

ii. Screenshot of an Airbnb rental confirmation page for a rental property in Florida from September 10, 2025 to October 10, 2025, with reservation code, 17614045712091, with a total payment amount of $495.40 and payment option to pay with Visa ending in 2981.

iii. Screenshot of a $400 Zelle payment to "NOBUAKI WATAY," with email address nobuakiwatay05@gmail.com. (CIFUENTES's PNC bank account records

under his alias LEONARDO QUISPE GARCIA confirm that Zelle payment was sent to WATAY.)

iv. Screenshot of an Airbnb rental confirmation page for a rental property in the Fiesta Key Community from September 28, 2025 to November 2, 2025 with reservation code HMPQYZKW5A, with a total payment amount of $341.78. This reservation code is the one generated for the Airbnb rental of 4707 Hemingway House Street, Kissimmee, Florida using WATAY's Airbnb account.

**October 29, 2025-November 2, 2025: Minnesota Trip**

73. Historical location information from T-Mobile shows that between October 29, 2025, and November 2, 2025, CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")**, SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")**, MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")**, and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** traveled from Florida to Minnesota. On October 29, 2025, all four devices left Florida, arriving in Minnesota on October 30, 2025. During this time period, a burglary occurred at 26XX Countryside Drive West, Orono, Minnesota on October 31, 2025. On November 2, 2025, all four devices left Minnesota and arrived in Florida on November 3, 2025. The travel pattern is consistent with all four devices traveling together in an automobile.

<u>October 31, 2025 – Burglary of 26XX Countryside Drive West, Orono, Minnesota</u>

74. On October 31, 2025, at approximately 10:24 p.m., officers of the Orono Police Department responded to a report of a burglary at 26XX Countryside Drive West, Orono, Minnesota. The rear patio sliding glass door was shattered, and a safe was stolen along with cash, guns, and precious metals. In reviewing the camera that was facing the pool on the north side of the home, one of the victims was able to determine the entry and exit time of the suspects, which showed the suspects at approximately 9:09 p.m. At approximately 11:23 p.m., the suspects could

be seen leaving from the same door as they entered carrying a safe. After clearing the victims' house, officers checked the park and found tire tracks, which had driven through the tall grass. Officers believed that the suspects carried the safe to the park and loaded it into a vehicle. Officers took photos of the tracks through the tall grass.

75. The homeowners reported an estimated total loss of approximately $18,700, which consisted of the theft of the following items: a Mossberg Model 590 shotgun (with an estimated value $700); various necklaces, earrings, and rings (with an estimated value of $10,000); a safe (with an estimated value of $1,500); cash in the safe (with an estimated value of $1,500); and, 100 ounces of silver bars (with an estimated value of $5,000).

76. The Orono Police Department continued their investigation and coordinated with the Waukesha County Sheriff's Department, including obtaining historical cell site location information for four numbers and IMSIs that the Waukesha County Sheriff's Office had identified in relation to the burglary on October 17, 2025, and determined that the same devices that had been involved in the burglary at W2XX N32XX Lost Creek Court, Delafield, Wisconsin on October 17, 2025 appeared to have been in Minnesota, particularly in the Old Crystal Bay Road and Watertown Road area in Long Lake and Orono, Minnesota, and in Edina and Eden Prairie, Minnesota.

77. A review of CIFUENTES' blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's device assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed the following related to the burglary of 26XX Countryside Drive West on 26XX Countryside Drive West, Orono, Minnesota on October 31, 2025:

a. Location information from CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**), include the following:

i. On October 30, 2025, CIFUENTES' device was located at or around 44.957731, -93.116752, 389 Charles Avenue, St. Paul, Minnesota at approximately 3:15 p.m.; at or around 44.909955, -93.364307, the woodline behind 5128 Skyline Drive, Minneapolis, Minnesota at approximately 7:16 p.m.; at or around 44.957748, -93.116748, back to 389 Charles Avenue, Minneapolis, Minnesota at approximately 10:38 p.m. (As described above, WATAY appears to have booked the Airbnb rental property where CIFUENTES and others stayed during the time period of the burglary using Rafael Cure's Airbnb account.)

ii. On October 31, 2025, CIFUENTES' device was located at or around 44.813703, -93.551356, Minnesota River Bluffs Trail near Bluff Creek Drive at approximately 12:52 a.m.; at or around 44.915960, -93.274623, 35W near East 48th Street and East 47th Street in Minneapolis, Minnesota at approximately 2:08 a.m.; at or around 44.957811, -93.116633, back to 389 Charles Avenue, Minneapolis, Minnesota at approximately 2:31 a.m.; at or around 44.978215, -93.591061, near PARK by Bradeys, north of 26XX Countryside Drive at approximately 10:39 a.m.; at or around 44.976228, -93.590438, 26XX Countryside Drive West, Orono, Minnesota between approximately 6:49 p.m. and 7:24 p.m.; at or around 44.957710, -93.126595, 625 Charles Avenue, St. Paul, Minnesota at approximately 8:26 p.m.

b. Photos and videos discovered within CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**), include the following:

i. Photo of an individual dressed in all black, standing near a body of water, holding what appears to be a black AR-15 style rifle, taken on October 31, 2025, at approximately 7:57 p.m., as seen below:



ii. Photo of an individual dressed in all black, which appeared to be CIFUENTES, standing near a body of water, holding what appears to be a black AR-15 style rifle with a black safe on the ground, taken on October 31, 2025 at approximately 7:56 p.m., as seen below. On March 22, 2026, the victim advised officers of the Orono Police Department that the rifle in the photo belonged to them, specifically, the rifle was a Black Rain Ordnance SPEC15 (Serial: SM020884). During an interview on March 12, 2026, the victim confirmed that the black safe on the ground was theirs.



iii. Screenshot of a Zelle payment of $180.00 to "NOBUAKI WATAY" with email address nobuakiwatay05@gmail.com, captured on November 1, 2025 at approximately 10:07 a.m.[3]

c. Location information recovered from SILVA's device includes the following:

[3] Records confirm that this payment was sent from CIFUENTES' PNC account under his alias LEONARDO QUISPE GARCIA with transaction ID PNCAA0Vba33X.

i. On October 31, 2025 at approximately 3:30 p.m., a Google Pin location was saved with GPS metadata of 44.973475, -93.584150, corresponding with an area near the trailhead of Luce Line State Trail, behind Countryside Drive West in Orono, Minnesota.

ii. On November 1, 2025, SILVA's device made a network connection at or around 44.957722, -93.116623, corresponding with 389 Charles Avenue, St. Paul, Minnesota at approximately 2:29 p.m.

iii. On November 3, 2025, SILVA's device made a network connection at or around 28.276169, -81.469300, corresponding with 4707 Hemingway House Street, Kissimmee, Florida. As described above, the records provided by Airbnb show that 4707 Hemingway House Street, Kissimmee, Florida 34746 was rented using WATAY's Airbnb account, with a start date of September 28, 2025 for 37 nights and four guests.

d. The following videos and photos were recovered from SILVA's device with assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) related to the burglary at 26XX Countryside Drive West, Orono, Minnesota on October 31, 2025:

i. A picture of two individuals standing over a black safe on the ground, with GPS metadata of 45.003241, -93.430223, corresponding with the shoreline near West Medicine Lake Park Beach in Plymouth, Minnesota, captured on October 31, 2025 at approximately 7:52 p.m., as seen below. During an interview on March 12, 2026, the victim confirmed that the black safe on the ground was theirs.



78. After leaving Minnesota, the four devices stopped at a cannabis dispensary in Carbondale, Illinois. Case agents obtained surveillance video from the cannabis dispensary, capturing a black Mercedes SUV arriving. This vehicle was later identified as a 2020 Mercedes-Benz GLC 350 (Florida: DM60TA), registered to an individual in Miami, Florida. The driver exited the vehicle and entered the store, where he was identified by an unknown country passport as "LEONARDO QUISEPE" (DOB: 01/07/1999) and later identified by law enforcement as LUCIANO ALEXIS SILVA CIFUENTES (DOB: 01/17/2002), a Chilean national. During the transaction, the male subject provided the store with telephone number 407-528-1751, the number identified as belonging to CIFUENTES as described above. The vehicle and devices returned to Florida.

November 4, 2025 - Arrest of SILVA and Posting of Bail in Hamilton County, Florida

79. On November 4, 2025, as CIFUENTES' device assigned IMSI *6195 **("T-Mobile IMSI 1")**, SILVA's device assigned IMSI *0125 **("T-Mobile IMSI 2")**, MELITA's device assigned IMSI *0105 **("T-Mobile IMSI 3")**, and ARENEDA's device assigned IMSI *0089 **("T-Mobile IMSI 4")** appeared ready to leave Florida again, the 2020 Mercedes-Benz GLC 350 (Florida: DM60TA) was stopped by the Hamilton County Sherrif's Department in Hamilton County, Florida. The driver was arrested for reckless driving and booked into the jail under the name "JOSE LUIS CENTENO COLONIA" of Peru, later identified by law enforcement as ENJERBET ALEJANDRO ROJAS SILVA (DOB: 04/27/2006), a Chilean national. Phone records

show that after the traffic stop, several of the devices traveled to a nearby gas station where they remained for about three hours before returning to the Kissimmee, Florida area.

80. On November 6, 2025, "CENTENO COLONIA" attempted to communicate from jail with phone number 321-316-9186 (associated with **"T-Mobile IMSI 2"**), which matched the phone number for SILVA's device. Phone number 321-316-9186 received a text message from an inmate messaging service which indicated "CENTENO COLONIA" was attempting to contact them. It is unclear if any communications occurred as Hamilton County Jail advised that they had no records of communications made by CENTENO COLONIA.

81. On November 7, 2025, CENTENO COLONIA was released from the Hamilton County Jail after his $6,000 cash bond was posted by a subject identified as "JESUS LAYA." Hamilton County Jail did not have any additional records regarding LAYA. It was later determined by the Waukesha County Sheriff's Department that CENTENO COLONIA was actually ENJERBET ALEJANDRO ROJAS SILVA based on a comparison of a booking photo.

82. After reviewing CIFUENTES' blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**), containing the name "Frank Luciano" and email address amadofrank1701@icloud.com, case agents determined that CIFUENTES had contacted WATAY to assist with releasing SILVA from the Hamilton County Jail and posting his bail, and that WATAY was concerned about immigration authorities detaining SILVA. That review revealed the following in part:

a. On November 5, 2025, CIFUENTES contacted NOBUAKI WATAY via WhatsApp messenger to ask for help in getting SILVA released from jail after his arrest. CIFUENTES provided WATAY with SILVA's alias, the one SILVA was arrested with, "JOSE LUIS CENTENO COLONIA" (DOB: 01/27/2004), so that

WATAY could locate SILVA. WATAY was listed in CIFUENTES' WhatsApp messenger as "TheBigMann" (78066047004848@lid).

b. On November 5, 2025 at approximately 6:46 a.m., TheBigMann account sent CIFUENTES information that the account had received from Airbnb that was addressed to "Nobuaki." Later on November 5, 2025 at approximately 1:45 p.m., TheBigMann account provided CIFUENTES with contact information and an address labeled "WATAY LARA, NOBUAKI JESUS, 4440 SW Archer" because CIFUENTES needed contact information to transfer money to WATAY.

c. On November 5, 2025 between approximately 12:21 p.m. and 1:44 p.m., TheBigMann account and CIFUENTES discussed the possibility of Immigration and Customs Enforcement grabbing SILVA if he is released. TheBigMann account then sends the following message to CIFUENTES: "Hermano si pagan es de una pero si le dijeron a ICE y los esperan al salir es el problema, dejame averiguar" which can be translated to, "Brother, if they pay, it's fine, but if they told ICE and they're waiting for them when they leave, that's the problem. Let me find out."

d. On November 6, 2025 at approximately 10:44 a.m., TheBigMann account sent a message containing "Nobuaki Watay 5614515293." Later on November 6, 2025 at approximately 2:24 p.m., "TheBigMann" account provided CIFUENTES with the following banking information to deposit money into: "WL express services LLC, Account 1100023983522, 1015 nw 21st ave Gainesville fl 32609." The information provided by the TheBigMann account indicates that NOBUAKI WATAY is the owner and user of TheBigMann account.

e. On November 6, 2025 at approximately 6:30 a.m., CIFUENTES advised WATAY that he sent him $1,800 via Zelle, but could only send $3,500 per day so he would use various methods to get WATAY money to help SILVA. Records provided by Zelle for CIFUENTES' Zelle account linked to his PNC Bank account under alias "LEONARDO QUISPE GARCIA" confirmed CIFUENTES's $1,800 payment to WATAY at 2:30 p.m. and another payment of $1,700 to WATAY via Zelle on November 6, 2025 at approximately 3:39 p.m. Later on November 6, 2025 at approximately 2:40 p.m., CIFUENTES sent WATAY a photo of a Truist Bank receipt showing a deposit of $1,080 into an account ending in 3522. On November 6, 2025 at approximately 2:56 p.m., CIFUENTES also sent WATAY a screenshot of a Ria money transfer receipt number 736249434, totaling 1,968,373 CLP (Chilean Pesos). This Ria receipt indicated the sender was "ERIKA ISABEL DE LOURDES ESPARZA" and the transfer was sent from Ria Chile Servicios Financieros S.P.A. Rut No 76.1343934-1, Avda. Libertador Bernardo, O'Higgins 1449 T.4 Ofic 1502, Santiago, Chile, telephone number 600-586-7777. The photo of the Ria receipt was slightly blurry at the bottom, but "JESUS WATAY LARA" can be made out at the bottom of the receipt in the beneficiary section.

f. On November 6, 2025 at approximately 7:10 p.m., WATAY sent a message to CIFUENTES indicating that the jail also accepts credit cards and he is $1,000 short of the required $6,000, so WATAY is bringing credit cards with him to pay the bail. WATAY sent CIFUENTES screenshots of Google Maps to show CIFUENTES that he was driving to the jail to release SILVA. On November 6, 2025 at approximately 10:30 p.m., WATAY sent a photo of an Inmate Commissary

Deposit with what appears to be the name "CENTENO COLONIA, JOSE LUIS" typed into the machine. WATAY sent a picture to CIFUENTES showing payment receipts totaling approximately $4,695.77 for "CENTENO COLONIA, JOSE" and told CIFUENTES that is all he can do today and would have to come back the following day for the remaining balance.

g. On November 7, 2025, WATAY sent a picture to CIFUENTES and a message indicating he had the $1,310 for the remaining balance. On November 7, 2025 at approximately 1:35 p.m., WATAY sent a photo of a payment receipt of $1,310 for "CENTENO COLONIA, JOSE." SILVA was released later that day.

83. On November 13, 2025, the 2020 Mercedes-Benz GLC 350 (Florida: DM60TA) was released from the private tow company to a subject identified as "VINCENT MILLER JR." after the tow bill was paid in cash.

**<u>November 12, 2025-November 16, 2025: Attempted Minnesota Trip</u>**

84. On November 11, 2025, WATAY and CIFUENTES communicated via WhatsApp about booking an Airbnb rental. Specifically, WATAY and CIFUENTES discussed the rental of a townhouse in North Saint Paul, Minnesota from November 12, 2025 to November 16, 2025. After WATAY successfully booked the rental property, CIFUENTES had car trouble in White Springs, Florida and advised WATAY that he needed to cancel the Airbnb and get help to fix his car. The conversation was recovered from CIFUENTES' device assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**).

85. CIFUENTES and WATAY communicated via WhatsApp, with WATAY using the WhatsApp account "TheBigMann" 78066047004848@lid, with telephone number 352-657-5918. On November 11, 2025, beginning at approximately 12:36 p.m., TheBigMann account sent an

Airbnb link, https://www.Airbnb.com/l/YyzWuHvU.[4] TheBigMann account confirmed with CIFUENTES by sending: "Este 100%?," which translates to, "This one, 100%?" CIFUENTES' device writes: "Si hmno," which appears to mean "Si, hermano," which translates to: "Yes, brother." TheBigMann account writes: "Ya Rafael lo va a agarrar y ava," which translates to "Rafael is going to get it, he's coming." TheBigMann account sent a screenshot of an Airbnb rental confirmation and the following messages: "Mira fue menor bro, no me pases los 80$ dejamost 300$ pendiente proxima semana y listo. Fue menos de lo que era," which translates to: "Look, it was less, bro, don't send me the $80, we'll leave $300 pending for next week and that's it. It was less than it was." CIFUENTES' device writes: "Okey dale esta bien. Gracia hmno," which translates to: "Ok, great, all good. Thanks, brother."

86. At approximately 2:44 p.m., CIFUENTES' device writes: "Tienes un mecanuco," which translates to "Do you have a mechanic?" TheBigMann account writes: "Te paró la policía?" which translates to "Did the police stop you?" CIFUENTES' device writes: "No hermano el vehiculo," which translates to: "No, brother, the vehicle." TheBigMann account writes: "Pásame location para preguntarle al mío de aquí bro," which translates to: "Send me your location, so I can ask my guy here, bro." At approximately 2:45 p.m., CIFUENTES' device sent an Apple Maps location with GPS location data of 30.303119, -82.791184, corresponding with Interstate 75 near Northwest Chloe Drive in White Springs, Florida. TheBigMann account writes: "Hermano mi mecánico es un gringo gringo cero español mándale tu location a este número," which translates to: "Bro, my mechanic is a Gringo, zero Spanish, send your location to this number," and then sent

[4] The hyperlink leads to a rental for a property in North Saint Paul, Minnesota, United States from November 12, 2025 to November 16, 2025 with an Airbnb host named "Nancy."

a screenshot with the number for “Chris Mechanic.” CIFUENTES’ device writes: “Ya hmno bkn. Gracias,” which translates to: “Yeah, bro, cool. Thanks.”

87. At approximately 5:23 p.m.: TheBigMann account sent screenshot of an Airbnb refund screen as seen below:




TheBigMann account writes: “Que si ella va a hacer un partial refund de la mayoría pero tiene que iniciarlo ella me dijo Airbnb y poner el monto, ando esperando a ver que lanza pero ella dice que si va a devolver que no hay problema, vamos a ver que dice bro,” which translates to “She said she’s going to do a partial refund of most of it, but she has to initiate it. She told me Airbnb and to enter the amount. I’m waiting to see what she says, but she says that if she’s going to do it, there’s no problem. Let’s see what she says, bro.” TheBigMann account sent screenshots of communications with Airbnb Host “Nancy” about cancelling and requesting a refund of the Airbnb due to the vehicle issues.

88. On November 12, 2025 and November 13, 2025, the conversation between CIFUENTES and WATAY continued. On November 12, 2025 between 7:27 a.m. and 9:13 a.m., TheBigMann account sent the screenshots of communications with Airbnb Host “Nancy” again about the cancellation and refund. At 7:28 p.m., theBigMann account writes: “Me desperté de una pensando en eso bro andamos ahí ligando que la señora Nancy haga lo que le toca,” which translates to: “I woke up thinking about that bro, we’re out here flirting, let Ms. Nancy do what

she has to do." On November 13, 2025 at 9:56 a.m., TheBigMann account writes: "Ok vamos a sacar cuentas Tú me tiene 350$ que es lo de la semana pasada y lo de Chris Y por el Airbnb me diste 200$ y la señora va a devolver 250$. Ósea aquí voy a tener 450$, quieres que me cobre los 350$ y te mando los 100$ restantes ? Dime a qué Zelle te los disparo," which translates to: "You owe me $350, which is from last week and Chris's money. And for the AirBNB, you gave me $200, and the lady is going to pay back $250. So here I'll have $450, do you want me to charge you $350 and send you the remaining $100? Tell me which Zelle account I'll send them to." At 10:00 a.m., CIFUENTES device writes to WATAY: "No hermano dame los 250$ y lo otro que yo te di para el bnb lo descuentas de lo que te debo. Yoe l lunes. Te doy lo que falta," which translates to: "No, brother, give me the $250 and the other thing I gave you for the bnb, you deduct it from what I owe you. And on Monday. I'll give you what's missing. At 10:01 a.m., the BigMann Account writes: "Ok descuento los 200$ y te mando 250$. Hoy le pregunto a Rafael si le cayó ya eso," which translates to, "Ok, Ill deduct the $200 and send you $250. Today I'm asking Rafael if he received that yet." At 10:01 a.m., CIFUENTES device writes to WATAY: "Si hmno," which translates to: "Yes, brother."

89. Records provided by Airbnb show that 2082 Park Row, North Saint Paul, Minnesota, was rented by Guest ID 43296121, under name "Rafael Cure", rafaelcure@yahoo.com, 1-786-720-9443, with a start date of November 12, 2025 for 4 nights and 2 guests. Records also show that this reservation was cancelled on November 12, 2025—the same date that CIFUENTES and WATAY communicated about cancelling the reservation with "Nancy," as described above.

**November 19, 2025-November 23, 2025: Minnesota Trip**

90. Historical location information from T-Mobile shows that between November 19, 2025 and November 23, 2025, CIFUENTES's phone number 407-528-1751 (associated with **"T-**

**Mobile IMSI 1"**) and SILVA's phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) returned to the greater Minneapolis area. During this time period, a burglary occurred at 63XX Westwood Court, Edina, Minnesota on November 20, 2025, and at 18XX Hunter Lane, Mendota Heights, Minnesota on November 21, 2025. According to the Waukesha County Sheriff's Department, based on its review of the historical location information it received from AT&T, URIBE's phone number 786-516-6535 (**"AT&T Call Number 1"**) was also traveling with CIFUENTES' and SILVA's devices during this time period.

91. Records provided by Airbnb show that 6800 Pillsbury Avenue, Richfield, Minnesota, was rented by Guest ID 43296121, under name "Rafael Cure", rafaelcure@yahoo.com, 1-786-720-9443, with a start date of November 19, 2025 for 5 nights and 1 guest.

<u>November 20, 2025 – Burglary of 63XX Westwood Court, Edina, Minnesota</u>

92. On November 20, 2025, at approximately 6:25 p.m., the Edina Police Department was dispatched to 63XX Westwood Court, Edina, Minnesota to assist with a report of a forced-entry burglary. Upon arrival, officers cleared the residence, starting at the glass patio door. The patio door was locked, and the center glass pane was shattered. There was an approximately two-inch hole at the bottom of the shattered glass. The house had been rummaged through. During a subsequent search of the exterior of the home, the Edina Police Department located a black and yellow flat crowbar lying on the ground in the corner by some evergreen trees and a tan leather mitten lying on top of a leaf covered portion of grass, with no leaves on top of the mitten. The Edina Police Department collected the crowbar and mitten as evidence. The victims were in Florida at the time of the burglary and left on Halloween, and their daughter and son responded to the residence with the homeowners on Facetime. The victims reported that some of the victim's

jewelry had been taken from her jewelry box, with a total estimated loss at the time of the report, based on the insurance documents, of $297,641.

93. A review of CIFUENTES's blue Apple iPhone 16 assigned call number ending in 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed the following relating to the burglary at 63XX Westwood Court, Edina, Minnesota:

a. Location information retrieved from CIFUENTES' device includes the following:

   i. On November 18, 2025, CIFUENTES' device was located at or around 28.250546, -81.590395, near 180 Villa Domani Court, Davenport, Florida at approximately 6:52 p.m.;

      1. Records provided by Airbnb show that 184 Villa Domani Court, Davenport, Florida 33896 was rented by Guest ID 308873178, which Airbnb identified as corresponding with subscriber information for "Nobuaki Watay," listing nobuakiw13@hotmail.com and 1-561-451-5293, with a start date of November 3, 2025 for 30 nights and 4 guests.

   ii. On November 20, 2025, CIFUENTES' device was located at or around 44.879674, -93.282177, 6800 Pillsbury Avenue, Richfield, Minnesota at approximately 9:57 a.m.; at or around 44.886633, -93.288197, Lakewinds Food at 6420 Lyndale Avenue South, Richfield, Minnesota at approximately 11:34 a.m.

b. Photos and videos recovered from CIFUENTES' device include the following:

i. On November 21, 2025, at approximately 12:36 a.m., a photo of CIFUENTES in a brown sweatshirt wearing two cross necklaces, as seen below. During an interview on March 11, 2026, the victims confirmed that both cross necklaces were theirs.



ii. On November 22, 2025, at approximately 8:44 p.m., a photo of CIFUENTES sitting at a wood table with various jewelry, precious metals, and jewelry boxes laid out on the table. There is a white binder bearing the words "Sunny Crest C," which is a binder connected to the Airbnb property, on the table as well, as seen below. During an interview on March 11, 2026, the victims confirmed that many of the items of jewelry were theirs, including the gold Rolex watch on the table, both necklaces worn by CIFUENTES, and a set of matching gold earrings, amongst others.



iii. On November 23, 2026, TheBigMann WhatsApp account sent the following message, addressed to "Rafael," referring to Rafael Cure, to CIFUENTES with checkout information for "Sunny Crest Cottage," the

name to associated with the Airbnb rental property at 6800 Pillsbury Avenue, Richfield, Minnesota:

From: 78066047004848@lid TheBigMann

¡Hola Rafael!

Esperamos que hayas tenido una excelente visita y hayas disfrutado de tu estancia. Para prepararte para la salida, te sugerimos consultar el Libro de Bienvenida para el procedimiento de salida. Para resumir lo que debes hacer, aquí tienes una lista rápida:

La salida es el 24 de noviembre de 2025 a las 10:00 a. m.
Por favor:
- Lavar los platos sucios
- Colocar las toallas usadas en la bañera
- Cerrar con llave la puerta principal después de salir.

¡Luego, simplemente sal y disfruta del día! ¡Gracias por elegir Sunny Crest Cottage!

**Priority:** Normal
**Status:** Read
**Platform:** Mobile

11/23/2025 6:10:59 PM(UTC-6)

c. Photos with embedded location information retrieved from SILVA's device include the following:

i. On November 21, 2025 at approximately 4:04 p.m., a photo of SILVA and another individual with a black pirate flag covering his face, identified as URIBE based on other photographs, both wearing various items of jewelry, as seen below. During an interview on March 11, 2026, the victims confirmed that many of the items of jewelry were theirs, including the multi-band pearl bracelet on SILVA's wrist, the diamond shaped silver necklace with purple gems around SILVA's neck, and the silver-and-gold colored watch on URIBE's wrist.



ii. On November 22, 2025 between approximately 1:09 p.m. and 1:27 p.m., photos of a table with various jewelry and foreign currency laid out on it and SILVA standing near the table with jewelry, with GPS metadata at or around 44.879711, -93.282220, corresponding with 6800 Pillsbury Avenue, Richfield, Minnesota, as seen below.



November 21, 2025 – Burglary at 18XX Hunter Lane, Mendota Heights, Minnesota

94. On December 6, 2025, at approximately 1:00 p.m., the Mendota Heights Police Department was dispatched to 18XX Hunter Lane, Mendota Heights, Minnesota to take a report of a burglary. Upon arrival, officers made contact with the homeowners' son who had been looking after the home, as the homeowners had been moved into assisted living facilities and had not been living at the home for some time. The homeowners' son advised that he was there to check on the home and observed that one of the back doors, a glass patio door, had a large hole in it. The

homeowners' son went through most of the house and noted that the master bedroom's walk-in closet had several open drawers, which appeared to have been rummaged through. The homeowners' son spoke with his brother, who stated the interior motion detector had pinged on November 21, 2025 between 5:45 p.m. and 5:49 p.m. The homeowners' son believed this was when the suspects were inside of the home. On March 12, 2026, case agents interviewed the daughter of the victims. During the interview, the victim's daughter believed that her parents had suffered a loss of approximately $5,000 to $10,000 in stolen jewelry, but was unsure as she was unfamiliar with her mother's jewelry.

November 22, 2025 – Burglary at 51XX Skyline Drive, Edina, Minnesota

95. On November 22, 2025 at approximately 11:40 a.m., the Edina Police Department was dispatched to a burglary at 51XX Skyline Drive, Edina, Minnesota, after the victims arrived home after being out of town for a couple of days and upon entering noticed a rear window broken at their home. One of the victims reported that no one had been at the residence since November 19, 20925 at approximately 8:00 p.m. Officers located a broken window on the rear side of the residence on the upper deck, and noticed that the screen for the window was laying on the deck below the window. After a walkthrough, the victim and police concluded that money had been taken from a container in the primary walk-in closet, some vintage records were taken, and a preliminary estimate of approximately $60,000 in various jewelry pieces were also missing.

96. A review of CIFUENTES's blue Apple iPhone 16 assigned call number ending in 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed the following relating to the burglary at 51XX Skyline Drive, Edina, Minnesota:

a. The location information, photos, and videos from CIFUENTES' device, as described above, is also pertinent to the burglary of 51XX Skyline Drive, Edina, Minnesota, specifically the following photo of CIFUENTES with items laid out on a table, as seen below. During an interview on March 11, 2026, the victim confirmed that many of the items of jewelry, including a matching set of Tiffany earrings and ring, silver keys, a gold-colored pen, and a South African Krugerrand gold coin, were theirs.



b. The location information, photos, and videos from SILVA's device, as described above, is also pertinent to the burglary of 51XX Skyline Drive, Edina, Minnesota, specifically the following photo of SILVA standing in front of a table with various jewelry and holding a set of matching earrings and a ring, as seen below. During an interview on March 11, 2026, the victim confirmed that many of the items of jewelry, to include a matching set of Tiffany earrings and ring held by SILVA, the gold-colored pen, the gold and silver-colored watch on the table, a silver-colored bracelet in the gray box, and the dark draw-string bag were theirs.



**December 3, 2025-December 7, 2025: Wisconsin Trip**

97. Historical location information from T-Mobile shows that between December 3, 2025 and December 7, 2025, CIFUENTES's phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) were located in Florida before returning to Wisconsin on December 3, 2025. According to the Waukesha County Sheriff's Department, URIBE's phone number 786-516-6535 (**"AT&T Call Number 1"**) was also plotting with CIFUENTES' and SILVA's devices during this time period. During this trip, an attempted burglary occurred in Fox Point, Wisconsin on December 4, 2025, a second attempted burglary occurred in Ledgeview, Wisconsin on December 5, 2025, and a successful burglary occurred in Verona, Wisconsin on December 6, 2025. CIFUENTES's phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**), SILVA's phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**), and URIBE's phone number 786-516-6535 (**"AT&T Call Number 1"**), remained in Wisconsin until returning to Florida on December 7, 2025. The travel pattern is consistent with all three devices traveling together in an automobile.

98. Records provided by Airbnb show that 5114 West Burnham Street, West Milwaukee, Wisconsin, was rented by Guest ID 43296121, under name "Rafael Cure," rafaelcure@yahoo.com, 1-786-720-9443, with a start date of December 3, 2025 for 5 nights and 3 guests.

<u>December 5, 2025 – Burglary of 34XX Weatherwood Lane, Ledgeview, Wisconsin</u>

99. On January 23, 2026, the Brown County Sheriff's Office was assigned to investigate a report of a burglary at 34XX Weatherwood Lane in the town of Ledgeview, Brown County, Wisconsin. The victims were out of town at the time of the burglary and had been since October 23, 2025. The complainant, an individual known to the victims, discovered the burglary

when they went inside the residence while house sitting. The complainant immediately called one of the homeowners who asked the complainant to call law enforcement.

100. The Brown County Sheriff's Office responded to the burglary call. One of the victims reported that they had not been home since October 2025, but had given the complainant permission to house sit. Investigators and the complainant conducted a walkthrough of the home observing items scattered in various locations around the home and ultimately walked down to the basement where the complainant pointed out that the two gun safes had been tampered with but were still locked. Evidence technicians responded to the scene and discovered there were toolmarks along the edges of the doors to the safes. Embedded in the toolmarks on the Remington gun safe was a red substance that was possibly paint transfer from the weapon used to cut the safe. There was a filing cabinet in the unfinished part of the basement. There were several files and papers strewn about on the floor next to this filing cabinet, and there appeared to be toolmarks on the inside of the top drawer. This drawer also appeared to be dented. A red substance was located on a light switch in the basement stairwell next to the garage.

101. On February 2, 2026, the victim reported that there were items missing from the home including three Crown Royal bags, which contained silver dollars, Sacagawea dollars, Susan B. Anthony dollars, half dollars, dimes, and $2 bills worth approximately $2,000.

102. A review of CIFUENTES's blue Apple iPhone 16 assigned call number ending in 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed the following:

a. Location information for CIFUENTES' device include the following:

   i. On December 3, 2025, CIFUENTES' device was located at or around 34.965662, -85.193855, Circle K at 4257 Cloud Springs Road, Ringgold,

Georgia at approximately 1:41 a.m.; at or around 43.010367, -87.977570, 5114 West Burnham Street, West Milwaukee, Wisconsin at approximately 7:36 p.m.

ii. On December 4, 2025, CIFUENTES' device was located at or around 43.010367, -87.977570, 5114 West Burnham Street, West Milwaukee, Wisconsin at approximately 9:18 a.m.

1. On December 2, 2025 at approximately 12:40 p.m., CIFUENTES sent the following message to WATAY via TheBigMann account: "Hmno cual el la direccion ??" which translates to, "Brother, what is the address?" TheBigMann account responds, "5114 West Burnham Street, West Milwaukee, Wisconsin 53219, United States," suggesting that WATAY had rented the Airbnb at CIFUENTES's request.

b. Photos discovered on CIFUENTES' device include the following:

i. On December 5, 2025 between approximately 7:45 p.m. and 7:46 p.m., two photos of black safes as seen below, consistent with the Remington safe belonging to the victims at 34XX Weatherwood Lane. During an interview with the victims on March 31, 2026, the victims confirmed the safes within the photos were theirs from inside their home.



ii. On December 5, 2025 at approximately 7:46 p.m., a photo of a masked man, believed to be CIFUENTES, standing in front of a black Remington branded safe, as seen below. During an interview with the victims on March 31, 2026, the victims confirmed that the photo shown above appeared to show an individual taking a photo in front of a safe that appeared consistent with the black Remington safe inside their home.



December 6, 2025 – Burglary at 39XX Caribou Road, Verona, Wisconsin

103. On December 6, 2025, a burglary was reported at 39XX Caribou Road, Verona, Wisconsin. The Dane County Sheriff's Department responded and conducted a follow-up investigation and interviews of the victims. The victims reported that they left town on December 5, 2025, at approximately 1:00 p.m. Investigators determined that on December 6, 2025, at approximately 6:37 p.m., two suspects arrived at a rear window of the residence, parked at Goth Park, and walked through a wooded area to the burglarized residence. At 6:44 p.m., the same two suspects entered the residence through a window that had been broken. At approximately 7:07 p.m., the suspects left the residence, exiting from the same window in which they entered, and appeared to follow their tracks back to Goth Park. The victims reported that an estimated $40,000 to $80,000 in U.S. currency and $150,000 to $200,000 in jewelry was taken from the residence.

104. A review of CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) revealed various photos dated December 6, 2025 between approximately 10:00 p.m. and 11:00 p.m. showing CIFUENTES and URIBE sitting and

laying on the floor with cash and a blue and yellow bag. CIFUENTES can be seen holding what appears to be a blue smartphone, as seen below. During an interview with the victims on April 24, 2026, the victims confirmed that the bracelet and ring worn by URIBE were confirmed to be the victims' jewelry and the blue bag with CIFUENTES was confirmed as the victim's bag.





105. A review of SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) revealed the following relating to the burglary at 39XX Caribou Road, Verona, Wisconsin:

a. On December 6, 2025 between approximately 9:00 p.m. and 11:30 p.m., photos depicting SILVA, CIFUENTES, and URIBE with cash, jewelry, and a blue and yellow handbag.

b. At approximately 10:15 p.m. with GPS coordinate metadata of -43.010272, -87.977548, corresponds with 5114 West Burnham Street, West Milwaukee, Wisconsin, and SILVA, CIFUENTES, and URIBE taking a selfie with cash on the floor as seen below. (As described above, records provided by Airbnb indicate that 5114 West Burnham Street, West Milwaukee, Wisconsin was rented using Rafael Cure's Airbnb account starting on December 3, 2025 for five nights and three guests.)



c. On December 2, 2025 at approximately 12:40 p.m., CIFUENTES sent the following message to WATAY via TheBigMann account: "Hmno cual el la direccion ??" which translates to, "Brother, what is the address?" TheBigMann account responds, "5114 West Burnham Street, West Milwaukee, Wisconsin 53219, United States," suggesting that WATAY had rented the Airbnb at CIFUENTES's request.

d. On December 8, 2025, at approximately 12:01 a.m., photos of cash in rubber bands being dumped from a white bag and organized on a clear glass table, as seen below.



106. A review of the contact lists of both CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's white Apple iPhone 16 assigned call number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) showed that each of them had the telephone number 305-897-7703 (the same number in the above-described

WhatsApp call at 7:25 p.m. on October 10, 2025) saved in their devices. CIFUENTES had the call number 305-897-7703 saved as "Amlita" and SILVA had the call number 305-897-7703 saved as "Melita." Based off the listed contact information corresponding with MELITA, case agents believe that call number 305-897-7703 is or was used by MELITA. Law enforcement database checks revealed that call number 305-897-7703 was hosted by T-Mobile during the time of the burglary on October 10, 2025.

107. As described above, CIFUENTES's phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**), SILVA's phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**), and URIBE's phone number 786-516-6535 (**"AT&T Call Number 1"**) remained in Wisconsin until returning to Florida on December 7, 2025. Records provided by Airbnb show that 6355 Southwest 30th Street, Miami, Florida, was rented by Guest ID 43296121, under the name "Rafael Cure", rafaelcure@yahoo.com, 1-786-720-9443, with a start date of December 8, 2025 for 2 nights and 3 guests.

108. Messages recovered from CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) show that the Airbnb at 6355 Southwest 30th Street, Miami, Florida was facilitated by WATAY and provided to CIFUENTES via TheBigMann Account on December 8, 2025 at approximately 6:39 p.m.. At approximately 6:38 p.m., CIFUENTES wrote: "Dame la dirección," which can be translated to: "Give me the address." WATAY responded: "Hola Rafael, Gracias por elegimos…" which can be translated to "Hi Rafael, thank you for choosing us…" WATAY also sent a follow-up message to CIFUENTES with the wifi connection details. WATAY went on: "6355 Southwest 30th Street, Miami, FL 33155, United States. . . Para entrar 1065," which can be translated to "To enter 1065." At 6:40 p.m., CIFUENTES wrote: "Pk" and "Vale hmno," which appears to mean: "Okay bro."

**December 10, 2025-December 11, 2025: Final Trip to Wisconsin**

109. As described above, location information from T-Mobile showed that on December 10, 2025, at approximately 7:00 p.m., CIFUENTES's device assigned phone number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) and SILVA's device assigned phone number 612-806-1110 (associated with **"T-Mobile IMSI 2"**) were traveling together as the devices left Florida on Interstate 75 heading north, reaching Wisconsin on December 11, 2025, when CIFUENTES, SILVA, and URIBE were stopped in the Dodge Durango and taken into custody by the Waukesha County Sheriff's Department.

110. Records provided by Airbnb show that 1323 South 85th Street, West Allis, Wisconsin, was rented by Guest ID 43296121, under name "Rafael Cure", rafaelcure@yahoo.com, 1-786-720-9443, with a start date of December 11, 2025 for 2 nights and 3 guests.

111. Messages recovered from CIFUENTES's blue Apple iPhone 16 assigned call number 407-528-1751 (associated with **"T-Mobile IMSI 1"**) show that the Airbnb at 1323 South 85th Street, West Allis, Wisconsin was facilitated by WATAY and provided to CIFUENTES via TheBigMann Account on December 10, 2025 at approximately 9:43 p.m. At approximately 6:10 p.m., CIFUENTES wrote: "Tienes la dirección ?," which can be translated to: "Do you have the address?" WATAY responded: "Confirmado," which can be translated to "Confirmed." CIFUENTES wrote: "Ah yayaha." At 9:43 p.m., WATAY responded: "1323 South 85th Street, West Allis, WI 53214, United States."

**August 2025-December 2025: Zelle Payments from CIFUENTES to WATAY**

112. According to a subpoena return from Early Warning Services, LLC, d/b/a Zelle, between the dates of September 10, 2025 and December 11, 2025, CIFUENTES, using his PNC Bank account under the name "LEONARDO QUISEPE GARCIA" with linked telephone number

of 407-528-1751 (associated with **"T-Mobile IMSI 1"**), sent approximately 21 electronic Zelle payments to "NOBUAKI WATAY" with linked email address of nobuakiwatay05@gmail.com totaling approximately $18,348.

113. According to the same subpoena return, between August 27, 2025 and October 14, 2025, CIFUENTES using his PNC Bank account under the name "LEONARDO QUISEPE GARCIA" with linked telephone number of 407-528-1751 (associated with **"T-Mobile IMSI 1"**), sent approximately two electronic Zelle payments to "Wl Express Services, Llc" with linked email address of altapinturajnk@hotmail.com, believed to be owned and utilized by WATAY, totaling approximately $1,540.

114. According to the Zelle subpoena, altapinturajnk@gmail.com is also linked to WL Express Services, LLC, WATAY's business, as well as a Capital One bank account with name "Nobuaki Watay." According to open-source research, altapinturajnk@gmail.com is provided as the contact email for WL Express Services, LLC and the phone number is provided on the website as 561-451-5293, WATAY's number. The contact information can be found at the following URL: https://wlexpressservicesllcsf.base44.app/Contact.

**CIFUENTES PNC BANK ACCOUNT x6127 ANALYSIS**

115. Records provided by PNC bank show that PNC bank personal account x6127 was opened on August 13, 2025 under the name LEONARDO M QUISPE GARCIA (the alias of CIFUENTES) as the sole signatory. Between August 13, 2025, and December 10, 2025, there were $33,413.86 in credits made into this account, and $29,720.00 of those credits were ATM deposits and $2,458.53 were Zelle deposits. Two of the eight Zelle deposits were from WATAY ($735 on November 5, 2025) and WL EXPRESS SERVICES LLC ($250 on November 14, 2025). During that same time, there were $33,318.50 in debits from the account. This included $5,335.30 in ATM

withdrawals and $26,128.11 in Zelle payments, of which $18,348.00 in Zelle debits were sent to WATAY between September 10, 2025 and December 10, 2025. An additional $1,540 was sent to WATAY'S business account for WL EXPRESS SERVICES LLC.

**BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION**

116. In my training and experience, I have learned that AT&T and T-Mobile (the "Providers") are companies that provide cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records."

117. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

118. I know that the Providers can collect and store historical cell-site data and historical E-911 Phase II data about the location of call numbers and IMSIs, including by initiating a signal to determine the location of the call number or IMSI on the Provider's networks or with such other reference points as may be reasonably available.

119. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers.

**Cell-Site Data**

120. Based on my training and experience, I know that the Providers can collect cell-site data about call number and IMSIs. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication. This information can be extremely useful when attempting to locate a suspect or identify his or her past historical location, and also to determine the existence, scope, and extent of a conspiracy, overt acts committed in furtherance of a conspiracy, and the identities of co-conspirators. I also know that wireless providers such as the Providers typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

121. I also know that wireless providers such as the Providers identified herein typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. Analyzing the incoming and outgoing phone numbers along with the duration, date, and time of who the subject is communicating with through the cellular service provider's records can assist law enforcement in identifying the other party to the call. Running those telephone numbers through normal investigative steps and searches through open-source public databases can lead to

the identification of specific locations such as a hotel, residence, or other type of physical address. When used in conjunction with cell-site and other precision location information, it can lead to identifying and confirming specific addresses or areas of interest where the subject has been. This information is also part of the service provider's call detail records (ordinary business records) associated with historical cell-site information and provides a more complete understanding and more accurate view of a subject's historical location.

**E-911 Phase II / GPS Location Data**

122. I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Providers can collect E-911 Phase II data about the location of call number and IMSIs, including by initiating a signal to determine the location of the call number or IMSI on the Provider's network or with such other reference points as may be reasonably available.

123. Based on my training and experience, I know that cellular providers such as the Providers identified herein can also collect Timing Advance data, which is also referred to as Per

Call Measurement Data ("PCMD"), the "real-time tool" ("RTT"), Network Event Location System (NELOS) data, and True Call data. Timing Advance data estimates the approximate distance of the cellular device from a cellular tower based upon the time it takes for signals to travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

**Pen-Trap Data**

124. Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), an International Mobile Equipment Identity ("IMEI"), a Subscription Permanent Identifier ("SUPI"), and/or a Network Access Identifier ("NAI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

**Subscriber Information**

125. Based on my training and experience, I know that wireless providers typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers typically collect and

retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the target call number's and IMSIs' user or users, and may assist in the identification of co-conspirators and victims.

126. Obtaining the precision cell site location information that reflects the movement of cellular telephones being used by a subject can provide information beneficial to law enforcement conducting an investigation. More broadly, based upon my training and experience, tracking the historical location of a subject frequently leads to evidence, including, but not limited to the identification of potential criminal associates, such as criminal co-conspirators, and the identification of physical locations at which unlawful conduct took place. Such information often corroborates and verifies information and investigative leads derived from other investigative techniques, including informants and live and recorded surveillance. Here, the requested historical location information may provide evidence related to the location of CIFUENTES, SILVA, URIBE, MELITA, and ARENEDA in and around the timeframe of the investigation.

**CONCLUSION**

127. Based on my training and experience in federal investigations involving transnational criminal organizations from Central and South America, and information provided by other experienced law enforcement officers who have focused on South American theft groups, the methods described above to conceal identifications and obfuscate movement in an effort to avoid detection via fraudulent identification, rental vehicles, non-attributable cellphones, and interstate travel is consistent with actions taken by South American Theft Groups (SATGs). These

SATGs are known to target expensive homes likely to contain items of value such as jewelry, cash, and other items of value. In my training and experience, and the search and seizure by Waukesha County Sheriff's Department of burglary tools such as Dewalt Sawzalls, window punches, lock pick kits, and antennas consistent with those used with Wi-Fi jammers are also indicative of burglary methods commonly utilized by SATGs to access homes that are well-secured and avoid detection by home security systems. Based on my training and experience, there is probable cause to believe that fruits, evidence, and instrumentalities of the target offenses will be found in the historical cell site location, historical precision location information, and subscriber information and other historic non-content records and information for the target call number and IMSIs in the providers' records, copies of which are currently in the custody of the WCSD.

128. Specifically, the WCSD obtained historical records from AT&T and T-Mobile relating to the target call number and IMSIs, the details of which are described in the corresponding warrants attached hereto as Exhibits 1 and 2. Although federal law enforcement might already have all necessary authority to examine the data that WCSD received pursuant to its warrants, I seek this additional warrant out of an abundance of caution to be certain that an examination of the data for evidence of the crimes described herein will comply with the Fourth Amendment and other applicable laws.

129. The electronic storage devices, on which the data to be searched is contained, are currently in storage at WCSD, which is located in the Eastern District of Wisconsin. Based on my training and experience and communications with members of the WCSD, I believe that the data to be searched has been stored in a manner in which it is, to the extent material to this investigation, in substantially the same state as they were when the data first came into the possession of WCSD.

130. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to Federal Rule of Criminal Procedure 41.

131. Because this warrant seeks only permission to examine data on storage devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

**MATTER NO. 2025R00391**

**ATTACHMENT A**

**Property to Be Searched**

1. An electronic storage device, which contains records from cellular service provider AT&T Corporation relating to call number **786-516-6535** (**AT&T Call Number 1**), marked as Property Number 331524 and stored in the Waukesha County Sheriff's Department Evidence Room, in the Eastern District of Wisconsin.

2. An electronic storage device, which contains records from cellular service provider T-Mobile US Inc. relating to International Mobile Subscriber Identifiers **310260126406195 (IMSI 1), 310260555960125 (IMSI 2)**, **310260620760105 (IMSI 3)**, and **310260423280089 (IMSI 4),** marked as Property Number 329927 and stored in the Waukesha County Sheriff's Department Evidence Room, in the Eastern District of Wisconsin.

## ATTACHMENT B

**Particular Things to be Seized**

All information that constitutes evidence and instrumentalities of violations of 18 U.S.C. §§ 371 (conspiracy to violate the laws of the United States), 2314 (interstate transportation of stolen goods), 2315 (sale or receipt of stolen goods, securities, or moneys), 1956 (concealment and promotion money laundering and conspiracy), and 1957 (spending money laundering), involving LEANDRO FELIPE PINO URIBE ("URIBE"), ENJERBET ALEJANDRO ROJAS SILVA ("SILVA"), LUCIANO ALEXIS SILVA CIFUENTES ("CIFUENTES"), ANDRES IGNACIO ISAAC MELITA ESPARZA ("MELITA"), and JORGE DARIO MARTINEZ ARENEDA ("ARENEDA").

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records in order to locate the things particularly described in this warrant.

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS HELD BY:

AT&T Global Legal Demands Center
Attn: Custodian of Records
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

DA CASE: 2025WK007163

ORDER GRANTING WARRANT FOR RECORDS OF COMMUNICATIONS OR OTHER INFORMATION HELD BY A PROVIDER OF ELECTRONIC COMMUNICATIONS SERVICES AND/OR REMOTE COMPUTING SERVICES, WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b), AND ORDER SEALING ALL DOCUMENTS RELATED TO THIS WARRANT

## FINDINGS AND ORDERS

1. Pursuant to Wis. Stat. §968.375(3), the State of Wisconsin, by Deputy District Attorney Chelsea Thompson, has filed a Request for a Warrant for Records of Communications or Other Information now under the custody and control of the custodian of records for AT&T Global Legal Demands Center.

2. The Request is supported by an affidavit of Detective Ross Seitz, a law enforcement officer employed by the Waukesha County Sheriff's Department, Waukesha County, Wisconsin.

3. Based upon its review of the District Attorney's request and the supporting affidavit, the Waukesha County Circuit Court, the Honorable K. Scott Wagner, **finds probable cause to believe that:**

a. The records of communications or other information identified in the accompanying Warrant do, or may, constitute evidence of the crime(s) of Burglary, contrary to Wis. Stat. §§ 943.10(1m)(a);



GOVERNMENT'S EXHIBIT
Affidavit Exhibit
1

b. The records named in the accompanying Warrant are now under the custody and control of the custodian of records for AT&T Global Legal Demands Center;

c. The above-named entity is a provider of electronic communications services or remote computing services subject to this Court's jurisdiction pursuant to Wis. Stat. § 968.375(1).

4. Pursuant to Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), the Court further finds that this Request for Warrant and Warrant is part of an ongoing criminal investigation and that secrecy regarding this Order and the Warrant is required in order to prevent the account or service subscriber or customer, or other persons, from receiving notice of the investigation generally and the Warrant because there is reason to believe that such notification will result in one or more of the following: endangering the life or physical safety of an individual, flight from prosecution, destruction of, or tampering with, evidence, intimidation of potential witnesses, or otherwise seriously jeopardizing an investigation.

5. The Court further finds that an Order to seal, until conclusion of the investigation or further order of the court, the Request for Warrant, these Findings and Orders, the Warrant, the supporting Affidavit, any subsequent "Return" by the law enforcement agency and any other documents filed with the Court in this matter is necessary and appropriate for the reasons given in paragraph 4 above and in order to protect the reputational interests of potentially innocent third parties and avoid the unnecessary disclosure of personal identifying information of innocent third parties.

**ORDERS FOR ISSUANCE, SERVICE AND RETURN OF WARRANT**

6. **NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

a. The requested Warrant shall be, and is, issued, pursuant to Wis. Stat. § 968.375(3) and 18 U.S.C. §§ 2703(a) or (b);

b. The Waukesha County Sheriff's Department shall serve the Warrant within five (5) days of

the date of this Order. Service may be through any means authorized under Wis. Stat. § 968.375(5);

c. The Waukesha County Sheriff's Department shall return the Warrant not later than five (5) days after the Waukesha County Sheriff's Department receives the records or information described in the Warrant.

**ORDERS FOR NON-DISCLOSURE AND SEALING**

**7. Under the authority provided by Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), THE COURT FURTHER ORDERS THAT:**

a. AT&T Global Legal Demands Center is prohibited from disclosing the receipt of, or the existence of, the Warrant, these Findings and Orders, and/or the investigation to any person (other than the provider's legal counsel), including the customer or subscriber of the service, without prior authorization of the Court until **June 18, 2026**; AND

b. The Clerk of Court shall seal all documents related to this Warrant, including but not limited to these Findings and Orders, the Warrant, the Warrant Return, the prosecutor's Request for Warrant, the supporting Affidavit, and any other documents filed in the matter, and they shall remain under seal until **June 18, 2026**, subject to any additional motions or orders extending this time period.

Dated at Waukesha, Wisconsin, this 22 day of December, 2025.

KSW

The Honorable K. Scott Wagner
Waukesha County Circuit Court Judge, Branch 1

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS HELD BY:

AT&T Global Legal Demands Center
Attn: Custodian of Records
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

DA CASE: 2025WK007163

REQUEST FOR WARRANT FOR COMMUNICATIONS OR OTHER INFORMATION HELD BY PROVIDER OF ELECTRONIC COMMUNICATIONS SERVICES AND/OR REMOTE COMPUTING SERVICES, WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b).

## REQUEST

NOW COMES Lesli S. Boese, District Attorney, and Chelsea Thompson, Deputy District Attorney, to request that, pursuant to the provisions of Wis. Stat. § 968.375(3) and 18 U.S.C. §§ 2703(a) and/or (b), this Court issue a Warrant for records or information held by the above-named provider of electronic communications services and/or remote computing services and issue further Orders as requested below.

This Request is made based upon the Affidavit of Detective Ross Seitz, provided with, and incorporated in, the Request. The Affidavit establishes that there is probable cause to believe that there are documents or other information, including the content of communications or historical location data for named communication devices, presently located at, or held by:

AT&T Global Legal Demands Center
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

a person/business subject to the jurisdiction of this Court under Wis. Stat. § 968.375(1), which documents or information constitutes evidence of the crime(s) of Burglary, contrary to Wis. Stat.

§§943.10(1m)(a), such that a Warrant should issue for the documents and information identified below and directed to the above-named person/entity and/or it's custodian of records.

The requested information as stated in the Warrant includes, but is not limited to:

1. **Certified records** of the following information about the customers or subscribers associated with the phone number (786) 516-6535 from August 5, 2025 to December 11, 2025, to include:

    a. Name(s) (including subscriber names, user names, and screen names), date(s) of birth;
    b. Addresses, mailing addresses, Post Office boxes, residential addresses, business addresses, email addresses and all other account related address information;
    c. Means and source of payment for such service (including any credit card or bank account number), billing records and types of service utilized;
    d. All telephone numbers associated with the account and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
    e. All account authorized users;
    f. Activation date(s) and termination date(s) for all device(s) associated with the account;
    g. Local and long distance telephone connection records;
    h. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
    i. Identifying details associated with all devices associated with the account including brand(s), model(s), MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
    j. Details of any reports of lost or stolen equipment and any equipment or SIM card changes for the history of the account;
    k. All account notes and customer service notes;
    l. Data Sessions information;
    m. Engineering Data information.

2. **Certified records** of any other information relating to phone number (786) 516-6535 from August 5, 2025 to December 11, 2025, to include:

a. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;
b. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS, and data; email addresses and IP addresses (including source and destination IP addresses);
c. Information regarding the cell towers and sectors through which the communications were sent and received;
d. All historical geo-location services/global positioning system (GPS) data/enhanced 911 (E911) records including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar un-named records held by the Provider)] which may be available to the Provider;
e. All SMS/MMS, and text message content, and all stored voice mail recordings;
f. All Content stored in remote storage or 'cloud accounts' associated with the target device including, but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, metadata and files or documents;
g. Records Key, Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, website and/or application connections, and cell site information.

Because the above-described records or information are being sought in connection with an ongoing investigation, and because premature disclosure of the investigation, including of this Request or any Warrant issued by the court, could hinder the investigation, the District Attorney requests, pursuant to the authority in Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), that the Court order that:

a. AT&T Global Legal Demands Center be prohibited from, without prior authorization of the Court until **June 18, 2026**, (1) disclosing the receipt of, or the existence of, the Warrant, these Findings and Orders, and/or the investigation to any person (other than the provider's legal counsel), including the customer or subscriber of the service and (2) closing the account; AND

b. The Clerk of Court seal all documents related to this Warrant, including but not limited to the Findings and Orders, the Warrant, the Warrant Return, the prosecutor's Request, and the supporting Affidavit, and that they remain UNDER SEAL until **June 18, 2026**, subject to any additional motions or orders extending this time period.

Dated at Waukesha, Wisconsin, this 19th day of December, 2025.

LESLI S. BOESE
District Attorney

/s/Chelsea Thompson
Chelsea Thompson
Deputy District Attorney
State Bar #1096710
State of Wisconsin, Waukesha County

Waukesha County District Attorney's Office
515 W. Moreland Blvd. Room CG-72
Waukesha, Wisconsin 53188
(262) 548-7076

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS HELD BY:

AT&T Global Legal Demands Center
Attn: Custodian of Records
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

DA CASE: 2025WK007163

WARRANT FOR CONTENT OF COMMUNICATIONS OR OTHER RECORDS, PURSUANT TO WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b).

DIRECTED TO:

AT&T Global Legal Demands Center
Attn: Custodian of Records
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

The Court having found probable cause to issue this Warrant, and having the authority to issue the same pursuant to Wis. Stat. §§ 968.375(1) and (3) and 18 U.S.C. §§ 2703(a) and/or (b), you are hereby required to provide Detective Ross Seitz, any and all of the following documents or information no later than January 18, 2026, unless such time is extended by order of this Court:

1. **Certified records** of the following information about the customers or subscribers associated with the phone number (786) 516-6535 from August 5, 2025 to December 11, 2025, to include:

    a. Name(s) (including subscriber names, user names, and screen names), date(s) of birth;
    b. Addresses, mailing addresses, Post Office boxes, residential addresses, business addresses, email addresses and all other account related address information;
    c. Means and source of payment for such service (including any credit card or bank account number), billing records and types of service utilized;

d. All telephone numbers associated with the account and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
e. All account authorized users;
f. Activation date(s) and termination date(s) for all device(s) associated with the account;
g. Local and long distance telephone connection records;
h. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
i. Identifying details associated with all devices associated with the account including brand(s), model(s), MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
j. Details of any reports of lost or stolen equipment and any equipment or SIM card changes for the history of the account;
k. All account notes and customer service notes;
l. Data Sessions information;
m. Engineering Data information.

2. **Certified records** of any other information relating to phone number (786) 516-6535 from August 5, 2025 to December 11, 2025, to include:

    a. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;
    b. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS, and data; email addresses and IP addresses (including source and destination IP addresses);
    c. Information regarding the cell towers and sectors through which the communications were sent and received;
    d. All historical geo-location services/global positioning system (GPS) data/enhanced 911 (E911) records including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar un-named records held by the Provider)] which may be available to the Provider;

e. All SMS/MMS, and text message content, and all stored voice mail recordings;
f. All Content stored in remote storage or 'cloud accounts' associated with the target device including, but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, metadata and files or documents;
g. Records Key, Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, website and/or application connections, and cell site information.

"Documents" include, but are not limited to, books, papers, records, recordings, tapes, photographs, films or computer or electronic data.

You may satisfy this Warrant by delivering the subject documents or information to Detective Ross Seitz by U.S. mail at the Waukesha County Sheriff's Department, 515 W. Moreland Boulevard, Waukesha, WI 53188, by facsimile at (262) 896-6818, or by email at rseitz@waukeshacounty.gov, or to his/her designee, on or before the ordered date.

**Pursuant to Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), you are ordered not to disclose the nature or contents of this Warrant, or the existence of this investigation, to anyone other than your legal counsel except upon specific order of the Court. <u>This prohibition includes the customer or subscriber related to the records sought through the Warrant</u>.**

Failure to comply with this Warrant may result in punishment for contempt of court.

Dated at Waukesha, Wisconsin, this 22 day of December, 2025.

K Scott [signature]

The Honorable K. Scott Wagner
Waukesha County Circuit Court Judge, Branch 1

2025WK007163

## CERTIFICATE OF SERVICE

I certify and admit that I have received this Warrant as provided in Wis. Stat. § 968.375(6).

Signed: ______________________________________________
(All persons who receive Warrants by mail must sign here)

Name: ______________________________________________
(Type or handwrite name here)

Dated: ______________________________________________

STATE OF WISCONSIN | CIRCUIT COURT | WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS OF:

AT&T Global Legal Demands Center
Attn: Custodian of Records
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

DA CASE: 2025WK007163

AFFIDAVIT OF DETECTIVE ROSS SEITZ IN SUPPORT OF A WARRANT FOR RECORDS PURSUANT TO WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b)

STATE OF WISCONSIN )
) SS
COUNTY OF WAUKESHA )

Affiant, being duly sworn on oath, states as follows:

1. I am currently employed as a Detective for the Waukesha County Sheriff's Department, Waukesha County, Wisconsin. I have been employed as a law enforcement officer for the past 14 years. I make this affidavit upon information and belief based upon my training and experience, my personal knowledge or information provided to me by fellow law enforcement officers or citizen witnesses, or all of the above, as described more fully below.

2. I have received extensive training and experience in the investigation of general crimes, including the analysis of relevant records, business records, transactions and correspondence, and analyzing and tracing digital information.

3. I am seeking **CERTIFIED** historical records that I have reason to believe are currently in the possession of:

AT&T Global Legal Demands Center
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

These records are more particularly described as follows:

1. **Certified records** of the following information about the customers or subscribers associated with the phone number (786) 516-6535 from August 5, 2025 to December 11, 2025, to include:

    a. Name(s) (including subscriber names, user names, and screen names), date(s) of birth;
    b. Addresses, mailing addresses, Post Office boxes, residential addresses, business addresses, email addresses and all other account related address information;
    c. Means and source of payment for such service (including any credit card or bank account number), billing records and types of service utilized;
    d. All telephone numbers associated with the account and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
    e. All account authorized users;
    f. Activation date(s) and termination date(s) for all device(s) associated with the account;
    g. Local and long distance telephone connection records;
    h. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
    i. Identifying details associated with all devices associated with the account including brand(s), model(s), MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
    j. Details of any reports of lost or stolen equipment and any equipment or SIM card changes for the history of the account;
    k. All account notes and customer service notes;
    l. Data Sessions information;
    m. Engineering Data information.

2. **Certified records** of any other information relating to phone number (786) 516-6535 from August 5, 2025 to December 11, 2025, to include:

    a. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;
    b. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS,

and data; email addresses and IP addresses (including source and destination IP addresses);

c. Information regarding the cell towers and sectors through which the communications were sent and received;
d. All historical geo-location services/global positioning system (GPS) data/enhanced 911 (E911) records including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar un-named records held by the Provider)] which may be available to the Provider;
e. All SMS/MMS, and text message content, and all stored voice mail recordings;
f. All Content stored in remote storage or 'cloud accounts' associated with the target device including, but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, metadata and files or documents;
g. Records Key, Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, website and/or application connections, and cell site information.

4. I believe that the records described above constitute evidence of the crime(s) of Burglary, contrary to Wis. Stat. §§943.10(1m)(a).

5. I believe that AT&T Global Legal Demands Center is a provider of an electronic communications service or remote computing service (as defined in Wis. Stat. §§ 968.27(5) and (14g), respectively) because I know from personal and professional experience that AT&T Global Legal Demands Center provides mobile communication and data service to subscribers in the State of Wisconsin.

6. Your affiant has learned that (786) 516-6535 has cell phone service through AT&T Global Legal Demands Center.

7. I am familiar with the process used by AT&T Global Legal Demands Center to comply with legal process. Based upon my previous experience with AT&T Global Legal Demands Center, I know that AT&T Global Legal Demands Center retains records and subscriber information for a time sufficient to allow law enforcement to receive copies of those records through the use of a subpoena/warrant and will comply with a Wisconsin court issued Warrant such as this served by mail and/or fax.

8. I am assigned to investigate a/an Burglary, contrary to Wis. Stat. §§943.10(1m)(a), which occurred September 5, 2025 through December 6, 2025 at W289 N3226 Lost Creek Court, Delafield, Waukesha County, Wisconsin, along with several other locations in both Wisconsin and Minnesota.

9. I believe the requested information will confirm: These records will assist your affiant with identifying Leandro Felip Pino Uribe's involvement in multiple known, and possibly unknown,

burglaries.

10. The facts tending to establish probable cause for the issuance of a Search warrant are detailed in Attachment A, which is attached hereto and incorporated herein.

11. Within five business days following receipt of the documents, I will prepare and submit to the clerk of courts a Return of this Warrant, accompanied by a written inventory of the documents received.

12. This investigation continues and is ongoing. I believe that secrecy of the request for this Warrant and this Affidavit in support, as well as the issuance of, all orders, returns and other related information concerning the requested Warrant, is appropriate and necessary in order to prevent premature disclosure of the status, progress, or details of the investigation, as reflected in this affidavit and to avoid the disclosure of possible sources of evidence, including sources over which one or more targets may have access or control. Further, based on my training and experience, I am aware, and I believe, that persons who know they are a target of a criminal investigation sometimes attempt to flee to avoid apprehension, tamper with, conceal or destroy evidence that remains within their control, threaten or harm witnesses or otherwise inappropriately influence witnesses. I am aware that the current investigation involves the use of computers or other digital devices and that the data stored on such devices may be relevant and probative evidence in any subsequent investigation or prosecution. I know from my training and experience that digital data can be recovered from storage devices/media even after long periods of time. However, I also know that digital devices or storage media (hard drives, USB drives, CD's, DVD's, etc.) can be easily concealed, moved, destroyed or damaged and thereby prevent a forensic analysis of the contents of those devices, even if they can be located. For these reasons, secrecy related to this investigation is necessary at this time so that law enforcement can complete the investigation, including seeking search warrants or other means to gain access to such devices/storage media while limiting the likelihood that the relevant data on them will be destroyed or lost.

13. I estimate that further investigation of this matter may take an additional 6 months.

#18643

Detective Ross Seitz

Subscribed and sworn to before me
this 19 day of December, 2025.

Notary Public, State of Wisconsin
My commission ~~is permanent~~ expires 2-20-27

LARA YUHAS
Notary Public
State of Wisconsin



Case 2:26-mj-00074-WED Filed 05/08/26 Page 99 of 165 Document 1

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS OF:

AT&T Global Legal Demands Center
Attn: Custodian of Records
11760 U.S. Highway 1, Suite 300
North Palm Beach, FL 33408

DA CASE: 2025WK007163

RETURN OF WARRANT ISSUED UNDER WIS. STAT. 968.375(3)

I hereby certify that, pursuant to a warrant for communications content and/or other records issued pursuant to Wis. Stats. § 968.375(3) in the above matter on ________________, which authorized the party to which the warrant was directed to comply with the warrant by responding directly to the Waukesha County Sheriff's Department. The following is a summary/inventory of the documents received in response to the warrant:

________________________________________________________________________

________________________________________________________________________

________________________________________________________________________

________________________________________________________________________

________________________________________________________________________

The above-described documents remain in the possession of the Waukesha County Sheriff's Department, subject to the disposition of the court. A copy of the warrant and supporting documents are attached hereto. **This "return" and its attachments are filed subject to any existing court orders for sealing of records related to this warrant.**

Dated this _____ day of ____________________________, 20 ____.

______________________________
Detective Ross Seitz

ATTACHMENT A

1. I have been a law enforcement officer since January 3, 2011. I am currently assigned to the Detective Bureau of the Waukesha County Sheriff's Department.

2. I have investigated a variety of crimes, including violent crimes and general property crimes in which cellular data was analyzed to locate evidence of the crime. I have further investigated a variety of crimes including sexual assault, physical abuse/neglect of children, drug distribution, financial crimes, and others by analyzing cellular data.

3. I know it is common practice for most people to rely heavily on the use of cellular telephones for many aspects of their daily lives. People commonly use cellular telephones to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos.

4. Your affiant is aware that AT&T, T-Mobile, Verizon, and U.S. Cellular are providers of an electronic communications service or remote computing service (as defined in Wis. Stat. §§ 968.27(5) and (14g), respectively) because I know from personal and professional experience that AT&T, T-Mobile, Verizon, and U.S. Cellular, provide mobile communication and data service to subscribers in the State of Wisconsin.

5. Your affiant believes these companies may possess information about the cellular devices on the network including but not limited to:

a. the telephone number and unique identifiers for each wireless device that communicated with the cell towers, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile

Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

b. the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

c. the date, time, type, and duration of each communication (starting and ending);

d. for each communication, the "sector(s)" (i.e. the face(s) of the tower(s)) that received a radio signal from the locally served wireless device;

e. the type of the communication transmitted through the tower (such as voice, text or data session); and,

f. all specialized location records including timing advance, real time tool (RTT), location database of record (LocDBoR), or similar which contain additional information not previously referenced above including but not limited to, estimated latitude and longitude (along with confidence level/margin of error) and distance from the tower.

6. Your affiant notes that this warrant does not authorize any additional account information (including basic subscriber or additional location information), and any further information will be requested via additional legal process.

7. Furthermore, your affiant notes that many returns may only have unique account identifiers (such as an IMSI) which are unable to be searched by law enforcement or attributed to an individual user without additional legal process. Additionally, even if a phone number is provided your affiant notes that identifying the actual user of the device may require additional legal process since additional records outside of the initial search parameters are not authorized within this warrant.

8. Affiant knows that the records sought are collected by the cellular telephone company at the cell sites or switches and this application does not request any data stored within the customer's cellular telephone.

a. Furthermore, by this application, affiant is only requesting records pertaining to cellular device registrations and communication detail records and does not seek to intercept or otherwise obtain any part of a customer's cellular communications or conversations (content).

9. Furthermore, by this application, affiant will only analyze the records for this case and any additional information requested will be submitted on a separate search warrant through establishing probable cause based on those devices identified which are consistent with the facts known to investigators.

10. Affiant is aware that service providers often need the GPS coordinates of a location in order to identify the appropriate cell sites and sectors that service the specified area or to query the available business records. During this investigation your affiant was provided the GPS coordinates of the locations described above by using Google Maps (https://www.google.com/maps). The additional locations requested below were also identified for warrant basis through Google Maps.

11. Affiant knows that cellular service providers maintain records of what cell phones connect to cell sites for periods anywhere between 7 days and up to 3 years, depending on the service provider.

12. Affiant does not know which cell phone service provider is providing service to the subject(s) phones and that more than one cell phone service provider may be used by one or more of the subjects. Therefore, the warrant is being directed to all cell phone service providers based on the locations and search parameters referenced above.

13. Affiant has a general understanding of how cellular telephone networks operate. Affiant is aware that cellular service providers strategically place cell sites (towers). The network is engineered to provide a seamless user experience and allow users to travel virtually anywhere and make or receive uninterrupted calls, send or receive text messages, and initiate a data session using their cellular phone. Usually, cell sites are mounted high on a large pole, building, or other structure that provides line of sight with the population below. Cell sites are also typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the users in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

14. Affiant is aware when a user either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business.

15. Usage event records, commonly referred to as call detail records (CDR's), stored by their respective cell phone company, typically contain the following information (with some exceptions based on the specific carrier): Date, time, type of event, duration, phone number initiating the usage event (called, calling). This data is collected even if caller identification is blocked by the calling party, text message transaction data, the International Mobile Equipment Identity (IMEI), the International Mobile Subscriber Identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

16. Affiant believes such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

17. Affiant is aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the

victim(s) or potential coconspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

18. Affiant knows that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving the records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records that would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, they could also assist in proving one's innocence.

19. **Subscriber Records** – Affiant is seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. Affiant is aware, depending on whether the account is post-paid or pre-paid; a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement.

a. The information required by most cellular service providers include the customer's personal identifying information, verified using government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional

information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes.

b. Affiant believes this information is relevant and material to the matter at hand as it serves multiple purposes including identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. Affiant knows that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In affiant's training and experience, some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

20. **Prepaid "Burner" Phones -** The term "burner phone" is a term commonly used to describe inexpensive cellular telephones that use pre-paid minutes and data and do not require identification or a credit check to activate service. Affiant is aware of the ease of a user being able to purchase and use these phones and how it has challenged law enforcement efforts to identify criminals, terrorist threats, and to locate wanted felons. It is

difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, Affiant knows of cases where pre-paid phones were used by suspects with the intent of concealing their actual identity. This facilitated their continued criminal actions and behavior.

a. Despite the lack of personally identifiable information, pre-paid accounts can still provide investigators with information to identify the user. By examining the call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

21. **Call Detail Records** – Affiant is seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In affiant's training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

a. In affiant's training and experience, individuals often use digital devices and cellular devices to post messages to others on social networking applications. In affiant's training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS (Short Message Service – text messaging) and MMS (Multimedia Message Service – sending text messages with other files such as pictures) technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, affiant seeks to search all the communication evidence maintained by the service provider.

b. Affiant is also seeking evidence of association. Affiant knows that establishing the association of coconspirators is important in proving a concert of action between multiple persons. In affiant's training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In affiant's training and experience, affiant knows that associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore affiant is seeking the call detail record evidence to demonstrate the associations of the individuals in this case.

22. **Specialized Location Records** – Affiant is aware cellular service providers maintain specialized location records consisting of engineering data. The data are used by the provider's engineers to troubleshoot coverage areas and report on potential dead spots

- all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, and data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures).

a. These records not only include the basic call detail records, but also an estimation of the target phone's location (latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phone's location and could place a target phone within close proximity of a crime scene before, during and after a crime. Each carrier uses their own nomenclature to describe the technology used to obtain this data including NELOS (Network Event Location System) – AT&T, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TruCall®, TDOA, Time Distance of Arrival, and MDT GPS – AT&T USA & Metro by AT&T.

b. Affiant believes this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

23. **Cloud Stored Data** – Affiant is aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets.

a. Your affiant has analyzed dozens of phone records in dozens of criminal investigations. Your affiant is aware that understanding a subject's "Pattern of Life" is essential in analyzing phone records. A subject's pattern of life, when referenced in the analysis of phone records, deals with the redundant activities of the user of the phone. For example, regular numbers the phone is in contact with, regular cell towers the phone connects to when making calls at certain times of the day and the frequency in which the phone is used would be examples of an individual's "pattern of life". Your affiant believes that in order to effectively analyze the call records and location information pertaining to an individual's phone records, a long duration of records is required to effectively complete the analysis. This is required in

order to compare the records on the date of the crime with the subject's pattern of life.

24. Your affiant was assigned to conduct follow-up investigation regarding a burglary that occurred on Friday, 10/17/25 between the hours of approximately 7:45 PM – 8:15 PM, at W289 N3226 Lost Creek Ct, Town of Delafield, County of Waukesha, Wisconsin. The information included comes through officers' reports from the Waukesha County Sheriff's Department, who your affiant believes to be truthful, and through your affiant's own investigation. All listed times are in Central Standard Time.

25. On 10/17/25 at about 9:00 PM, the complainant, Victim A returned home, W289 N3226 Lost Creek Ct, and upon entry found that a rear glass patio door was broken and items were strewn about the residence. Due to Victim A being unaware if an intruder was still on scene, she ran to a neighbor's house, at which time the Waukesha County Sheriff's Department was called to respond and investigate. The investigation is documented by Waukesha County Sheriff's Department Incident Report W25072497.

26. Upon Deputies arrival they secured the residence, finding no one inside. Deputies observed that a suspect or suspects, appeared to have entered the residence through a broken glass patio door on the main level. Shards of glass from the broken door were observed on the interior of the residence. During a walkthrough of the residence, it appeared that the suspect(s) primarily targeted bedrooms on the upper level, specifically the master bedroom, as multiple jewelry cases and drawers were open, along with clothes scattered about. Victim A later confirmed that approximately 100 pieces of jewelry were missing from the empty jewelry cases. It was noted that the suspects appeared to remove a pillowcase from a pillow in the master bedroom, presumably to carry the stolen items.

The scene was photographed, and several surfaces were fingerprinted for possible evidence left by the suspect(s).

27. Victim A provided information that the residence is primarily occupied by her and her husband along with their adult son. Victim A advised that her husband was currently out of town. Victim A left the residence earlier that night at about 6:30 PM, to go to dinner with a friend. When she left, her son was still home, however, he reported leaving the house at about 7:15 PM to watch a sporting event at a local restaurant. The residence is equipped with ADT motion sensors, which the family was retroactively able to review. The motion sensors detected regular movement in the house between about 7:48 PM – 8:12 PM, believed to be associated with the suspect(s).

28. A neighborhood canvass was conducted; however, no one was able to clearly identify any suspicious activity that occurred at Victim A's residence during the time of the burglary. It should be noted that the residence is at the end of a cul-de-sac, bordered by woods.

29. The method of this burglary was found to match, or be very similar to, other reported burglaries in both Waukesha County and Ozaukee County – City of Mequon. On Friday, 9/5/25, a burglary occurred in the same Town of Delafield neighborhood detailed above, N32 W29431 Mozart Rd. The residence is at the end of a cul-de-sac, bordered by woods. Entry was gained by breaking a glass rear patio door. A pillowcase was also removed, and several items of jewelry were taken from the master bedroom. The suspects are believed to have been scared away by the returning homeowners, and some items of stolen jewelry were located through a wooded path at the rear of the residence. This case

was assigned to Waukesha County Sheriff's Detective Jeremy Stilling, Incident Report W25062520.

30. On Friday, 10/10/25, the Mequon Police Department investigated a burglary at 2401 W. Range Line Terrace, City of Mequon. The residence is on a cul-de-sac, bordering woods. Entry was made through a broken window outside of a second-floor balcony. The suspect(s) targeted the master bedroom/master bathroom, and a large amount of jewelry was stolen. As the homeowners had recently stripped the beds of linen, they were unsure if a pillowcase was missing. This investigation is documented by Incident Report 25-027167, assigned to Detective Charles O'Connell.

31. On Thursday, 10/16/25, the Mequon Police Department investigated a burglary at 10139 Hunt Club Ct, City of Mequon. The residence is on a cul-de-sac, bordering woods. The suspect(s) entered the residence through a broken glass patio door. Items stolen included jewelry, cash, and silver coins. A police K-9 track led investigating officers to believe that the suspect(s) utilized the woods to approach and exit the residence. The homeowners confirmed that a pillowcase was also removed from the bed and missing, located in the same room where jewelry was taken. This investigation is documented by Incident Report 25-027665, assigned to Detective Charles O'Connell.

32. On 10/31/25, your affiant was contacted by Det. O'Connell who shared a video obtained via a trail camera from a resident at 13700 Hillside Drive, City of Mequon. The video, taken on Thursday, 10/30/25 at about 7:30 PM, depicted three individuals walking through the woods near the Hillside Drive residence. The three individuals all appeared to be wearing gloves or masks, carrying backpacks. As the individuals approached the trail camera, they immediately turned around and went the opposite way.

The resident who owned the trail camera received a live time notification of the activity. Law enforcement responded to the scene to establish a perimeter and locate the suspects; however, the three individuals were not found.

33. On 11/4/25, your affiant was contacted by Investigator Daniel Hughes, Washington County Sheriff's Office, who reported a similar burglary which occurred on 11/1/25 at 3106 Wedgewood Dr, Colgate. This residence is also located on a cul-de-sac, surrounded by woods. Investigator Huges indicated that between approximately 7:00 PM – 10:00 PM, unknown suspects entered the residence by breaking a rear bedroom window. The suspects targeted cash and jewelry, leaving behind other valuables such as electronics.

34. Your affiant has regularly communicated with the investigators assigned to these burglaries. During our communications, we have identified many commonalities between the burglaries, including some details regarding the suspect(s) methods, which are being withheld to preserve the integrity of the ongoing investigations. At this time, your affiant believes it is likely all six burglaries were committed by the same suspect(s).

35. Through additional research and communication with other law enforcement agencies, your affiant has learned that these burglaries are consistent with many being conducted nationwide by suspects associated with South American Theft Groups (SATG). These suspects have been known to target expensive homes, often containing high value items such as jewelry. Entry to the home is often made through a glass door or window. They are known to conduct extensive surveillance of the targeted residences and their occupants, including the use of various techniques to avoid detection by home security systems.

36. Your affiant previously (10/28/25) served warrants on T-Mobile, AT&T, U.S. Cellular, and Verizon for Tower Dump / Areas Search records which would identify phone numbers or devices which were in the vicinity of several of the reported burglaries. On 11/5/25, your affiant received records from T-Mobile, which were subsequently provided to Waukesha Sheriff's Detective David Schoeder, assigned to the Compute Forensics Lab, for review.

37. Detective Schroeder advised that after reviewing the records from T-Mobile, there were four International Mobile Subscriber Identifiers (IMSI), which were suspects in this investigation. The four suspect IMSI's were identified as: **310260423280089**, **310260126406195**, **310260555960125**, and **310260620760105**. Detective Schroeder based this off the fact these four IMSI's were each in the area of Delafield during the investigative timeframe and in the area of Mequon during the investigative timeframe. More specifically, he identified the following:

a) IMSI **310260423280089** was in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:44 PM to 7:32 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 8:21 PM to 8:22 PM.

b) IMSI **310260126406195** is in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:42 PM to 7:31 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 7:56 PM to 8:21 PM.

c) IMSI **310260555960125** is in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:43 PM to 7:25 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 7:49 PM to 8:21 PM.

d) IMSI **310260620760105** is in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:42 PM to 6:54 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 7:30 PM to 8:21 PM.

38. Based on the distance between Lost Creek Ct – Town of Delafield, and Hunt Club Cir – City of Mequon, your affiant believed it was likely that the same four IMSI being detected near the burglaries, on different days but times consistent with both burglaries, would be consistent with the unknown suspect(s). Your affiant previously served an additional warrant to T-Mobile for records associated with the four IMSI numbers listed above.

39. On 11/19/25, T-Mobile produced the records associated with four T-Mobile accounts related to the IMSI numbers. The records did not include any identifying subscriber information, but did include call and text history, location data, related IMEI's, and the identification of the phone numbers associated with each IMSI.

a. **310260423280089 / phone number 612-221-2511**
b. **310260126406195 / phone number 407-528-1751**
c. **310260555960125 / phone number 321-316-9186**
d. **310260620760105 / phone number 321-316-9199**

40. Location data was analyzed for the above phone records which provided a timeline of activity related to the above devices. The location history indicated that between about 9/3/25 – 11/2/25, the devices routinely traveled back and forth across the country, believed to originate from Florida. Historical data was available for IMSI *6195 beginning on 8/20/25, IMSI *0089 beginning on 9/4, and IMSI's *0105 & *0125 beginning on 9/10/25. A summary of the movement is detailed below:

a. 8/20/25 – 9/2/25: *6195 is in Florida until 9/2/25
b. 9/3/25: *6195 arrives in Minnesota
c. 9/4/25: *0089 appears in Minnesota
d. 9/7/25: devices leave Minnesota
e. 9/8/25: devices arrive in Florida

f. 9/10/25: *0105 & *0125 also appear in Florida

g. 9/16/25: devices (all) leave Florida

h. 9/17/25: devices arrive in Wisconsin

i. 9/21/25: devices leave Wisconsin

j. 9/22/25: devices arrive in Florida

k. 10/7/25: devices leave Florida

l. 10/8/25: devices arrive in Minnesota

m. 10/12/25: devices leave Minnesota

n. 10/13/25: devices arrive in Florida

o. 10/14/25: devices leave Florida

p. 10/15/25: devices arrive in Wisconsin

q. 10/16/25 & 10/17/25: T/Delafield and Mequon connected burglaries

r. 10/18/25: devices leave Wisconsin

s. 10/19/25: devices arrive in Florida

t. 10/22/25: devices leave Florida

u. 10/23/25: devices arrive in Minnesota (related burglary in Mendota Heights, MN)

v. 10/27/25: devices leave Minnesota

w. 10/28/25: devices arrive in Florida

x. 10/29/25: devices leave Florida

y. 10/30/25: devices arrive in Minnesota (related burglaries in Orono, MN and Lake Elmo, MN)

z. 11/2/25: devices leave Minnesota

41. Your affiant is currently in communication with several law enforcement agencies in the Greater Minneapolis area regarding the suspect devices being present at their burglaries.

42. On 11/2/25, after leaving Minnesota, the suspect devices stopped at a cannabis dispensary in Carbondale, IL. Related surveillance footage from the business detailed a black Mercedes SUV arriving. This vehicle was later identified as a 2020 Mercedes GLC 350, Florida registration DM60TA, registered to a subject in Miami, FL. The driver exited the vehicle and entered the store, where he was identified by an unknown country's passport as "Leonardo Quispe", DOB 1/7/1999. The driver appeared to be a Hispanic male, approximately 5'02" tall. The above name and date of birth were unable to be verified. During the transaction, the above male provided the store his phone number of **407-528-1751**, previously identified as a suspect phone number.

43. The vehicle and devices returned to Florida, and on 11/4/25, as they appeared ready to leave the state again, the Mercedes was stopped by the Hamilton County Sheriff's Office (FL). The driver was arrested (reckless driving) and booked into their jail under the name "Jose Luis Centeno Colonia" of Peru. Phone records show that following the time of the traffic stop, several of the devices traveled to a nearby gas station where they remained for about three hours, before returning to the Kissimmee, FL area. It's believed that some of the suspects may have been passengers in the Mercedes during the traffic stop, however, the associated report does not mention them. Additional follow-up is ongoing with the Hamilton County Sheriff's Office for these records.

44. On 11/6/25, "Centeno Colonia" attempted to communicate from the jail with another previously identified suspect phone number, **321-316-9186**. This was discovered as the phone number **321-316-9186**, received a text message from an inmate messaging service which indicated "Centeno Colonia" was attempting to contact them. It's

unclear if any communications occurred as Hamilton County Jail advised they had no records of communications made by "Centeno Colonia".

45. On 11/7/25, "Centeno Colonia" was released from the Hamilton County Jail after his $6,000 cash bond was posted by a subject identified as "Jesus Laya". Hamilton County Jail did not have any additional records regarding this "Laya" subject. It was later determined that "Centeno Colonia" gave false identifying information and his true identity was Enjerbet Alejandro Rojas-Silva, DOB 04/27/2006, of Chile.

46. On 11/13/25, the Mercedes SUV was released from the private tow company to a subject identified as "Vincent Miller Jr." after the tow bill was paid in cash. Since that time, a review of the Flock Safety camera system has documented the Mercedes operating in the North Miami, Fl area.

47. On 12/5/25, your affiant served a Pen Register Trap & Trace (PRTT) warrant to T-Mobile for records associated with suspect phone numbers, **612-221-2511, 407-528-1751, 321-316-9186, 321-316-9199.** T-Mobile provided records which indicated that two of the above numbers, ***2511 & *9199**, no longer had active accounts; number ***1751** was active and providing current location data, and number ***9186**, associated with **IMSI - 310260555960125**, had recently changed its phone number, but the account was still active. Your affiant obtained a second Pen Register Trap & Trace warrant to T-Mobile for updated records related to **IMSI – 310260555960125**, which was served on 12/9/25. T-Mobile identified the new telephone number assigned to IMSI ***0125**, as **612-806-1110**.

48. After serving the above warrants, T-Mobile provided updated location records related to phone numbers *1751 and *1110 (two current active lines) dating back to 11/10/25. The records detailed that between 11/20/25 – 11/23/25, the two suspect

devices had travelled back to Minnesota. The obtained data was shared with investigators in the Greater Minnesota area, who linked the suspect devices to two reported burglaries on 11/20/25 in Edina, MN; and on reported burglary on 11/21in Mendota Heights, MN.

49. The suspect devices returned to Florida, before returning to Wisconsin on 12/3/25. The devices remained in Wisconsin until returning to Florida on 12/7/25. During this time frame, burglaries were reported on 12/4/25 in Fox Point, WI; 12/5/25 in De Pere, WI; and 12/6/25 in Middleton, WI. Your affiant was able to compare know locations of the suspect devices on the above dates, which detailed the suspect devices at each burglary location during the burglary times. Through a comparison of known locations of the suspect devices to Flock Safety traffic cameras, your affiant identified the vehicle used by the suspects as a White Nissan Rogue SUV, Florida registration FMSB90 This vehicle was found to be registered to a Carlos Xavier Ortiz Rivera of Casselberry, FL. Flock records documenting the vehicles' movement from Florida to Wisconsin, and back to Florida, was consistent with the burglary locations and the locations of the suspect devices.

50. Your affiant began reviewing regularly updated location data on the two devices, which T-Mobile provided following the service of the Pen Register Trap & Trace warrants.

51. On 12/10/25, at approximately 7:00 PM, the suspect devices were detected travelling together as they left Florida on Interstate 75, heading north. At 10:19 PM, a Flock Safety camera observed a Red Dodge Durango, Florida registration DW01LC, near I-75 at Mile Marker 74 NB, in Turner County, GA. T-Mobile records for the suspect devices placed them in the same area. A check of the vehicles registration identified it as a red 2022 Dodge Durango, VIN - 1C4RDHDGXNC101523, registered to the same Carlos

Xavier Ortiz Rivera of Casselberry, FL. At about 8:20 AM on 12/11/25, a Flock camera observed the Dodge Durango near Marion, IL (#16 The Hill / East of 57). The T-Mobile records for the suspect devices again placed them near Marion, IL. At about 11:09 AM, a license plate reader under the control of the Illinois State Police, captured the Dodge Durango on I-55-104, at the same time the T-Mobile records placed the devices on I-55 near Divernon, IL. At 2:27 PM, an Illinois State Police camera captured the Dodge Durango on I-90 at Newburg Rd, Rockford, IL. T-Mobile location data, placed the devices on I-90, also in Rockford, IL.

52. Your affiant continued monitoring the T-Mobile location data for the two devices, in conjunction with Flock Safety cameras, and determined that the Dodge Durango and devices were traveling together. During the continued monitoring, your affiant learned that the vehicle and devices had entered Wisconsin and were traveling northbound on Interstate 43, approaching Waukesha County. This information was relayed to deputies with the Waukesha County Sheriff's Office, who conducted a traffic stop on the Dodge Durango on I-43, near STH 83, Village of Mukwonago.

53. Three occupants of the vehicle were subsequently identified as;

a. Driver: Luciano Alexis Silva Cifuentes, DOB 1/17/2002, found in possession of a blue Apple iPhone 16, assigned known suspect phone number **407-528-1751**. This subject originally provided identification for "Leonardo M. Quispe Garcia, DOB 1/7/1999", a previously used fictitious alias identified by law enforcement.
b. Front Seat Passenger: Enjerbet Alejandro Rojas Silva, DOB 4/27/2006, found in possession of a white Apple iPhone 16, assigned known suspect phone number **612-806-1110**.
c. Back Seat Passenger: Leandro Felipe Pino Uribe, DOB 12/2/2005, found in possession of a black Apple iPhone 13, assigned phone number **786-516-6535**, previously unknown to law enforcement.
d. A fourth phone, black Samsung Galaxy A16, was located in the rear passenger area of the vehicle and has yet to be associated with one of

the three subjects above. This device appeared to be assigned phone number "110028195695608" and associated with email, acertijoperseverante@gmail.com.

54. A search warrant was obtained to search for and seize property from the Dodge Durango. Items believed to be associated with burglary tools were recovered, including a Sawzall and blades, Husky brand center hole punches (believed to be used to break glass), and 26 black antennas similar to those used in WiFi signal jammers. Additional items recovered included fraudulent international identifying documents for the above individuals, who were all found to be from Chile.

55. The three above individuals were taken into custody regarding immigration violations and charges related to burglary / possessing burglary tools. The three subjects were subsequently transported to the Waukesha County Jail and booked on the above charges.

56. On 12/12/25, your affiant conducted a recorded interview with Rojas Silva. During the interview, Rojas Silva admitted to conducting multiple burglaries over the past few months, implicating both Silva Cifuentes and Pino Uribe in burglaries.

57. Your affiant previously obtained historical location record from T-Mobile related to the phones now attributed to Rojas Silva and Silva Cifuentes. These records placed their devices in the vicinity of multiple burglaries dating back to October 2025. Your affiant now wishes to obtain historical location records and communications for the device/account associated with Pino Uribe, phone number **786-516-6535**, to determine his possible involvement in the burglaries.

58. Your affiant utilized the LexisNexis online database, which your affiant has used in the past and found to be accurate, to look up the phone number and determine the

service provider. The phone number, **786-516-6535**, was found to be serviced by AT&T Mobility. Your affiant contacted AT&T, speaking with a representative of their Global Legal Demands Center, who confirmed the above number and related records, were under the control of AT&T.

59. Your affiant now requests a warrant for the AT&T records, related to the ongoing investigation into Burglary, Wis. Stat. § 943.10(1m)(a).

60. Based upon my training and experience, I believe that it is necessary to protect the nature and scope of ongoing criminal investigations, and I request the Court to seal the requested orders and warrants as well as their supporting applications and affidavits. I believe that failure to maintain the secrecy of this investigation could assist the burglary suspects, and/or their associate[s], in flight to avoid prosecution; may result in the destruction of or tampering with evidence; and would otherwise seriously jeopardizing an investigation or unduly delaying a trial based on the nature and scope of the investigation described in subsection (b) above. Further, actionable information derived from pen registers and trap and trace devices and locating information is sensitive, and the premature disclosure of such information may cause the target of this investigation or persons with whom the target associates to change their current practices. This disclosure, in effect, would make it extremely difficult for law enforcement to utilize existing technologies to aid in the apprehension of known or suspected criminals and to protect the public. I request that this sealing period begin upon execution of the Order and continue until further order of the court.

STATE OF WISCONSIN | CIRCUIT COURT | WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS HELD BY:

T-Mobile
Attn: Custodian of Records
4 Sylvan Way
Parsippany, NJ 07054

DA CASE: 2025WK007163

ORDER GRANTING WARRANT FOR RECORDS OF COMMUNICATIONS OR OTHER INFORMATION HELD BY A PROVIDER OF ELECTRONIC COMMUNICATIONS SERVICES AND/OR REMOTE COMPUTING SERVICES, WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b), AND ORDER SEALING ALL DOCUMENTS RELATED TO THIS WARRANT

## FINDINGS AND ORDERS

1. Pursuant to Wis. Stat. §968.375(3), the State of Wisconsin, by Deputy District Attorney Chelsea Thompson, has filed a Request for a Warrant for Records of Communications or Other Information now under the custody and control of the custodian of records for T-Mobile.

2. The Request is supported by an affidavit of Detective Ross Seitz, a law enforcement officer employed by the Waukesha County Sheriff's Department, Waukesha County, Wisconsin.

3. Based upon its review of the District Attorney's request and the supporting affidavit, the Waukesha County Circuit Court, the Honorable Michael P. Maxwell, **finds probable cause to believe that:**

a. The records of communications or other information identified in the accompanying Warrant do, or may, constitute evidence of the crime(s) of Burglary, contrary to Wis. Stat. §§ 943.10(1m)(a);

b. The records named in the accompanying Warrant are now under the custody and control of



GOVERNMENT'S EXHIBIT
Affidavit Exhibit
2

the custodian of records for T-Mobile;

c. The above-named entity is a provider of electronic communications services or remote computing services subject to this Court's jurisdiction pursuant to Wis. Stat. § 968.375(1).

4. Pursuant to Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), the Court further finds that this Request for Warrant and Warrant is part of an ongoing criminal investigation and that secrecy regarding this Order and the Warrant is required in order to prevent the account or service subscriber or customer, or other persons, from receiving notice of the investigation generally and the Warrant because there is reason to believe that such notification will result in one or more of the following: endangering the life or physical safety of an individual, flight from prosecution, destruction of, or tampering with, evidence, intimidation of potential witnesses, or otherwise seriously jeopardizing an investigation.

5. The Court further finds that an Order to seal, until conclusion of the investigation or further order of the court, the Request for Warrant, these Findings and Orders, the Warrant, the supporting Affidavit, any subsequent "Return" by the law enforcement agency and any other documents filed with the Court in this matter is necessary and appropriate for the reasons given in paragraph 4 above and in order to protect the reputational interests of potentially innocent third parties and avoid the unnecessary disclosure of personal identifying information of innocent third parties.

**ORDERS FOR ISSUANCE, SERVICE AND RETURN OF WARRANT**

6. **NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

a. The requested Warrant shall be, and is, issued, pursuant to Wis. Stat. § 968.375(3) and 18 U.S.C. §§ 2703(a) or (b);

b. The Waukesha County Sheriff's Department shall serve the Warrant within five (5) days of the date of this Order. Service may be through any means authorized under Wis. Stat.

§ 968.375(5);

c. The Waukesha County Sheriff's Department shall return the Warrant not later than five (5) days after the Waukesha County Sheriff's Department receives the records or information described in the Warrant.

## ORDERS FOR NON-DISCLOSURE AND SEALING

7. **Under the authority provided by Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), THE COURT FURTHER ORDERS THAT:**

a. T-Mobile is prohibited from disclosing the receipt of, or the existence of, the Warrant, these Findings and Orders, and/or the investigation to any person (other than the provider's legal counsel), including the customer or subscriber of the service, without prior authorization of the Court until **May 6, 2026**; AND

b. The Clerk of Court shall seal all documents related to this Warrant, including but not limited to these Findings and Orders, the Warrant, the Warrant Return, the prosecutor's Request for Warrant, the supporting Affidavit, and any other documents filed in the matter, and they shall remain under seal until **May 6, 2026**, subject to any additional motions or orders extending this time period.

Dated at Waukesha, Wisconsin, this 10th day of November, 2025.

The Honorable Michael P. Maxwell
Waukesha County Circuit Court Judge, Branch 8

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS HELD BY:

T-Mobile
Attn: Custodian of Records
4 Sylvan Way
Parsippany, NJ 07054

DA CASE: 2025WK007163

REQUEST FOR WARRANT FOR COMMUNICATIONS OR OTHER INFORMATION HELD BY PROVIDER OF ELECTRONIC COMMUNICATIONS SERVICES AND/OR REMOTE COMPUTING SERVICES, WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b).

**REQUEST**

NOW COMES Lesli S. Boese, District Attorney, and Chelsea Thompson, Deputy District Attorney, to request that, pursuant to the provisions of Wis. Stat. § 968.375(3) and 18 U.S.C. §§ 2703(a) and/or (b), this Court issue a Warrant for records or information held by the above-named provider of electronic communications services and/or remote computing services and issue further Orders as requested below.

This Request is made based upon the Affidavit of Detective Ross Seitz, provided with, and incorporated in, the Request. The Affidavit establishes that there is probable cause to believe that there are documents or other information, including the content of communications or historical location data for named communication devices, presently located at, or held by:

T-Mobile
4 Sylvan Way
Parsippany, NJ 07054

a person/business subject to the jurisdiction of this Court under Wis. Stat. § 968.375(1), which documents or information constitutes evidence of the crime(s) of Burglary, contrary to Wis. Stat.

§§943.10(1m)(a), such that a Warrant should issue for the documents and information identified below and directed to the above-named person/entity and/or it's custodian of records.

The requested information as stated in the Warrant includes, but is not limited to:

1. **Certified records** of the following information about the customers or subscribers associated with the phone number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**, to include:

    a. Name(s) (including subscriber names, user names, and screen names), date(s) of birth, social security and/or tax ID number(s);
    b. Addresses, mailing addresses, Post Office boxes, residential addresses, business addresses, email addresses and all other account related address information;
    c. Means and source of payment for such service (including any credit card or bank account number), billing records, payment history to include method(s), date(s), and time(s) of payment(s), and location including retail store name(s), address(es), and phone number(s) where payment(s) and/or purchase(s) were made, and types of service utilized and subscribed to use;
    d. All telephone numbers associated with the account and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
    e. All account authorized users;
    f. Activation date(s) and termination date(s) for all device(s) associated with the account;
    g. Local and long distance telephone connection records;
    h. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
    i. Identifying details associated with all devices associated with the account including brand(s), model(s), MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
    j. Details of any reports of lost or stolen equipment and any equipment or SIM card changes for the history of the account;
    k. All account notes and customer service notes;
    l. Data Sessions information;
    m. Engineering Data information.

2. **Certified records** of any other information relating to phone number

**Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**, to include:

a. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;
b. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS, and data; email addresses and IP addresses (including source and destination IP addresses);
c. Information regarding the cell towers and sectors through which the communications were sent and received;
d. All historical geo-location services/global positioning system (GPS) data/enhanced 911 (E911) records including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar unnamed records held by the Provider)] which may be available to the Provider;
e. All SMS/MMS, and text message content, and all stored voice mail recordings;
f. All Content stored in remote storage or 'cloud accounts' associated with the target device including, but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, metadata and files or documents;
g. Records Key, Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, website and/or application connections, and cell site information.
h. Call / Text / Data Detail Records: All records associated with the identified mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers**, also to include all numbers that communicate with this listed number relating to all delivered and undelivered inbound and outbound calls, text messages, and text message content to any of the above listed numbers, all voice mail, and all data connections from **August 5, 2025 – November 6, 2025**; and to include Cell-site and sector, date, time, direction, duration, number called or text to and/or received from, and bytes up/down, information related to each call, text or data connection, all text message content, and voicemails, as well as Call to Destination/Dialed Digits search for all numbers listed above. Please preserve all cell-site and sector information related to each call, text or data connections.

i. Specialized Location Records: All call, voice, text (SMS & MMS), and data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

j. Time on Tower and / or Sector: All cell-site and sector information related to each number called to and/or received from, and data connections, specific to the **"Time on Tower" and/or Sector**, to include information with the start and end date and time for each time the connection was involved in a **"hand-off"** to another cell-site and/or sector, to include the elapsed time (in seconds) for each **"hand-off"**, that was used during and throughout each voice call (whether completed or not), and/or which was used during and throughout each data session for the mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

k. Electronically Stored Records: All records associated with the identified mobile number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** to include all stored communication or files, including voice mail, text messages, including numbers text to and received from and all related content, e-mail, digital images (e.g. pictures), contact lists, video calling, web activity (name of web site or application visited or accessed), domain accessed, data connections (to include Internet Service Providers (ISPs), Internet protocol (IP) addresses, (IP) Session data, (IP) Destination Data, bookmarks, data sessions, name of web sites and/or applications accessed), date and time when all web sites, applications, and/or third party applications were accessed and the duration of each web site, application, and/or third party application was accessed, and any other files including all cell site and sector information associated with each connection and/or record associated with the cell number identified as **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

l. Cloud Storage: Content stored in remote storage or 'cloud accounts' associated with the phone number **Unknown phone number – IMSI:**

**310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers**, including but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, and files or documents from **August 5, 2025 – November 6, 2025**.

m. Cell Site List(s): List of all cell-sites as of **November/2025** for all state(s) in which the above records used cell locations. Cell site lists to include switch, cell-site number, name, physical address, longitude and latitude, all sectors associated with each cell-site, azimuth, and beam-width of each related sector. If multiple technologies (CDMA, UMTS, GSM, LTE etc.) are referenced in the records, all appropriate corresponding cell site lists will also be provided.

n. Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, web site and/or application connections, and cell site information. The "carrier key" is a legend related to the types of responsive data received from the service provider, which contain the record column header labels and their definitions of what each cell value represents in the spreadsheet. Carrier keys are required to decipher what the values represent in these cells, as many of these values may be presented in codes only known to the service provider.

Because the above-described records or information are being sought in connection with an ongoing investigation, and because premature disclosure of the investigation, including of this Request or any Warrant issued by the court, could hinder the investigation, the District Attorney requests, pursuant to the authority in Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), that the Court order that:

a. T-Mobile be prohibited from, without prior authorization of the Court until **May 6, 2026**, (1) disclosing the receipt of, or the existence of, the Warrant, these Findings and Orders, and/or the investigation to any person (other than the provider's legal counsel), including the customer or subscriber of the service and (2) closing the account; AND

b. The Clerk of Court seal all documents related to this Warrant, including but not limited to the Findings and Orders, the Warrant, the Warrant Return, the prosecutor's Request, and the supporting Affidavit, and that they remain UNDER SEAL until **May 6, 2026**, subject to any additional motions or orders extending this time period.

Dated at Waukesha, Wisconsin, this 7th day of November, 2025.

Lesli S. Boese
District Attorney

/s/Chelsea Thompson
Chelsea Thompson
Deputy District Attorney
State Bar #1096710
State of Wisconsin, Waukesha County

Waukesha County District Attorney's Office
515 W. Moreland Blvd. Room CG-72
Waukesha, Wisconsin 53188
(262) 548-7076

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS HELD BY:

T-Mobile
Attn: Custodian of Records
4 Sylvan Way
Parsippany, NJ 07054

DA CASE: 2025WK007163

WARRANT FOR CONTENT OF COMMUNICATIONS OR OTHER RECORDS, PURSUANT TO WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b).

DIRECTED TO:

T-Mobile
Attn: Custodian of Records
4 Sylvan Way
Parsippany, NJ 07054

The Court having found probable cause to issue this Warrant, and having the authority to issue the same pursuant to Wis. Stat. §§ 968.375(1) and (3) and 18 U.S.C. §§ 2703(a) and/or (b), you are hereby required to provide Detective Ross Seitz, any and all of the following documents or information no later than December 7, 2025 unless such time is extended by order of this Court:

1. **Certified records** of the following information about the customers or subscribers associated with the phone number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**, to include:

    a. Name(s) (including subscriber names, user names, and screen names), date(s) of birth, social security and/or tax ID number(s);
    b. Addresses, mailing addresses, Post Office boxes, residential addresses, business addresses, email addresses and all other account related address information;

c. Means and source of payment for such service (including any credit card or bank account number), billing records, payment history to include method(s), date(s), and time(s) of payment(s), and location including retail store name(s), address(es), and phone number(s) where payment(s) and/or purchase(s) were made, and types of service utilized and subscribed to use;
d. All telephone numbers associated with the account and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
e. All account authorized users;
f. Activation date(s) and termination date(s) for all device(s) associated with the account;
g. Local and long distance telephone connection records;
h. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
i. Identifying details associated with all devices associated with the account including brand(s), model(s), MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
j. Details of any reports of lost or stolen equipment and any equipment or SIM card changes for the history of the account;
k. All account notes and customer service notes;
l. Data Sessions information;
m. Engineering Data information.

2. **Certified records** of any other information relating to phone number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**, to include:

    a. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;
    b. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS, and data; email addresses and IP addresses (including source and destination IP addresses);
    c. Information regarding the cell towers and sectors through which the communications were sent and received;

d. All historical geo-location services/global positioning system (GPS) data/enhanced 911 (E911) records including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar unnamed records held by the Provider)] which may be available to the Provider;
e. All SMS/MMS, and text message content, and all stored voice mail recordings;
f. All Content stored in remote storage or 'cloud accounts' associated with the target device including, but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, metadata and files or documents;
g. Records Key, Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, website and/or application connections, and cell site information.
h. Call / Text / Data Detail Records: All records associated with the identified mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers**, also to include all numbers that communicate with this listed number relating to all delivered and undelivered inbound and outbound calls, text messages, and text message content to any of the above listed numbers, all voice mail, and all data connections from **August 5, 2025 – November 6, 2025**; and to include Cell-site and sector, date, time, direction, duration, number called or text to and/or received from, and bytes up/down, information related to each call, text or data connection, all text message content, and voicemails, as well as Call to Destination/Dialed Digits search for all numbers listed above. Please preserve all cell-site and sector information related to each call, text or data connections.
i. Specialized Location Records: All call, voice, text (SMS & MMS), and data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.
j. Time on Tower and / or Sector: All cell-site and sector information related to each number called to and/or received from, and data connections, specific to the **"Time on Tower" and/or Sector**, to include information with the start

and end date and time for each time the connection was involved in a **"hand-off"** to another cell-site and/or sector, to include the elapsed time (in seconds) for each **"hand-off"**, that was used during and throughout each voice call (whether completed or not), and/or which was used during and throughout each data session for the mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

k. Electronically Stored Records: All records associated with the identified mobile number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** to include all stored communication or files, including voice mail, text messages, including numbers text to and received from and all related content, e-mail, digital images (e.g. pictures), contact lists, video calling, web activity (name of web site or application visited or accessed), domain accessed, data connections (to include Internet Service Providers (ISPs), Internet protocol (IP) addresses, (IP) Session data, (IP) Destination Data, bookmarks, data sessions, name of web sites and/or applications accessed), date and time when all web sites, applications, and/or third party applications were accessed and the duration of each web site, application, and/or third party application was accessed, and any other files including all cell site and sector information associated with each connection and/or record associated with the cell number identified as **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

l. Cloud Storage: Content stored in remote storage or 'cloud accounts' associated with the phone number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers**, including but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, and files or documents from **August 5, 2025 – November 6, 2025**.

m. Cell Site List(s): List of all cell-sites as of **November/2025** for all state(s) in which the above records used cell locations. Cell site lists to include switch, cell-site number, name, physical address, longitude and latitude, all sectors associated with each cell-site, azimuth, and beam-width of each related sector. If multiple technologies (CDMA, UMTS, GSM, LTE etc.) are referenced in the records, all appropriate corresponding cell site lists will also be provided.

n. Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, web site and/or application connections, and cell site information. The "carrier key" is a legend related to the types of responsive data received from the service provider, which contain the record column header labels

and their definitions of what each cell value represents in the spreadsheet. Carrier keys are required to decipher what the values represent in these cells, as many of these values may be presented in codes only known to the service provider.

"Documents" include, but are not limited to, books, papers, records, recordings, tapes, photographs, films or computer or electronic data.

You may satisfy this Warrant by delivering the subject documents or information to Detective Ross Seitz by U.S. mail at the Waukesha County Sheriff's Department, 515 W. Moreland Boulevard, Waukesha, WI 53188, by facsimile at (262) 896-6818, or by email at rseitz@waukeshacounty.gov, or to his/her designee, on or before the ordered date.

**Pursuant to Wis. Stat. § 968.375(10) and 18 U.S.C. § 2705(b), you are ordered not to disclose the nature or contents of this Warrant, or the existence of this investigation, to anyone other than your legal counsel except upon specific order of the Court. <u>This prohibition includes the customer or subscriber related to the records sought through the Warrant</u>.**

Failure to comply with this Warrant may result in punishment for contempt of court.

Dated at Waukesha, Wisconsin, this 10th day of November, 2025.

The Honorable Michael P. Maxwell
Waukesha County Circuit Court Judge, Branch 8

**CERTIFICATE OF SERVICE**

I certify and admit that I have received this Warrant as provided in Wis. Stat. § 968.375(6).

Signed: ______________________________________________
(All persons who receive Warrants by mail must sign here)

Name: ______________________________________________
(Type or handwrite name here)

Dated: ______________________________________________

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR COMMUNICATIONS/RECORDS OF:

T-Mobile
Attn: Custodian of Records
4 Sylvan Way
Parsippany, NJ 07054

DA CASE: 2025WK007163

**RETURN OF WARRANT ISSUED UNDER WIS. STAT. 968.375(3)**

I hereby certify that, pursuant to a warrant for communications content and/or other records issued pursuant to Wis. Stats. § 968.375(3) in the above matter on ________________________, which authorized the party to which the warrant was directed to comply with the warrant by responding directly to the Waukesha County Sheriff's Department. The following is a summary/inventory of the documents received in response to the warrant:

________________________________________

________________________________________

________________________________________

________________________________________

________________________________________

The above-described documents remain in the possession of the Waukesha County Sheriff's Department, subject to the disposition of the court. A copy of the warrant and supporting documents are attached hereto. **This "return" and its attachments are filed subject to any existing court orders for sealing of records related to this warrant.**

Dated this ______ day of __________________________, 20 _____.

________________________________________

Detective Ross Seitz

STATE OF WISCONSIN | CIRCUIT COURT | WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS OF:

T-Mobile
Attn: Custodian of Records
4 Sylvan Way
Parsippany, NJ 07054

DA CASE: 2025WK007163

AFFIDAVIT OF DETECTIVE ROSS SEITZ IN SUPPORT OF A WARRANT FOR RECORDS PURSUANT TO WIS. STAT. § 968.375(3) AND 18 U.S.C. §§ 2703(a) AND/OR (b)

STATE OF WISCONSIN )
) SS
COUNTY OF WAUKESHA )

Affiant, being duly sworn on oath, states as follows:

1. I am currently employed as a/an Detective for the Waukesha County Sheriff's Department, Waukesha County, Wisconsin. I have been employed as a law enforcement officer for the past 14 years. I make this affidavit upon information and belief based upon my training and experience, my personal knowledge or information provided to me by fellow law enforcement officers or citizen witnesses, or all of the above, as described more fully below.

2. I have received extensive training and experience in the investigation of general crimes, including the analysis of relevant records, business records, transactions and correspondence, and analyzing and tracing digital information.

3. I am seeking **CERTIFIED** historical records that I have reason to believe are currently in the possession of:

T-Mobile
4 Sylvan Way
Parsippany, NJ 07054

These records are more particularly described as follows:

3. **Certified records** of the following information about the customers or subscribers associated with the phone number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**, to include:

    a. Name(s) (including subscriber names, user names, and screen names), date(s) of birth, social security and/or tax ID number(s);
    b. Addresses, mailing addresses, Post Office boxes, residential addresses, business addresses, email addresses and all other account related address information;
    c. Means and source of payment for such service (including any credit card or bank account number), billing records, payment history to include method(s), date(s), and time(s) of payment(s), and location including retail store name(s), address(es), and phone number(s) where payment(s) and/or purchase(s) were made, and types of service utilized and subscribed to use;
    d. All telephone numbers associated with the account and other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);
    e. All account authorized users;
    f. Activation date(s) and termination date(s) for all device(s) associated with the account;
    g. Local and long distance telephone connection records;
    h. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;
    i. Identifying details associated with all devices associated with the account including brand(s), model(s), MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");
    j. Details of any reports of lost or stolen equipment and any equipment or SIM card changes for the history of the account;
    k. All account notes and customer service notes;
    l. Data Sessions information;
    m. Engineering Data information.

4. **Certified records** of any other information relating to phone number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**, to include:

   a. Records of user activity for each connection made to or from the Account, including log files; messaging logs; the date, time, length, and method of connections; data transfer volume; user names; and source and destination Internet Protocol addresses;
   b. The date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers); call detail records for voice, SMS, MMS, and data; email addresses and IP addresses (including source and destination IP addresses);
   c. Information regarding the cell towers and sectors through which the communications were sent and received;
   d. All historical geo-location services/global positioning system (GPS) data/enhanced 911 (E911) records including any available ranging data [distance from tower, range to tower (PCMD/RTT/REVEAL/Historic MLTs, TrueCall, TDOA or Timing Advance Information or other similar unnamed records held by the Provider)] which may be available to the Provider;
   e. All SMS/MMS, and text message content, and all stored voice mail recordings;
   f. All Content stored in remote storage or 'cloud accounts' associated with the target device including, but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, metadata and files or documents;
   g. Records Key, Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, website and/or application connections, and cell site information.
   h. <u>Call / Text / Data Detail Records</u>: All records associated with the identified mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers**, also to include all numbers that communicate with this listed number relating to all delivered and undelivered inbound and outbound calls, text messages, and text message content to any of the above listed numbers, all voice mail, and all data connections from **August 5, 2025 – November 6, 2025**; and to include Cell-site and sector, date, time, direction, duration, number called or text to and/or received from, and bytes up/down, information related to each call, text or data connection, all text message content, and voicemails, as well as Call to Destination/Dialed Digits search for all numbers listed above. Please preserve all cell-site and sector information related to each call, text or data connections.

i. Specialized Location Records: All call, voice, text (SMS & MMS), and data connection location information and transactions (registration of network events), related to all specialized carrier records that may be referred to as LOCDBOR (Location Database), Historical Mobile Locate (HML), NELOS (Network Event Location System), RTT (Round Trip Time/Return Trip Time/Real Time Tool), PCMD (Per Call Measurement Data), TDOA (Time Difference of Arrival) or Timing Advance Information, Mediation Records, E9-1-1, and/or Historical GPS/Mobile Locate Information which shows GPS location (longitude and latitude) and Cell-Site and sector of the device in relationship to the network when connected to the network for the mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

j. Time on Tower and / or Sector: All cell-site and sector information related to each number called to and/or received from, and data connections, specific to the **"Time on Tower" and/or Sector**, to include information with the start and end date and time for each time the connection was involved in a **"hand-off"** to another cell-site and/or sector, to include the elapsed time (in seconds) for each **"hand-off"**, that was used during and throughout each voice call (whether completed or not), and/or which was used during and throughout each data session for the mobile number(s) **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

k. Electronically Stored Records: All records associated with the identified mobile number **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** to include all stored communication or files, including voice mail, text messages, including numbers text to and received from and all related content, e-mail, digital images (e.g. pictures), contact lists, video calling, web activity (name of web site or application visited or accessed), domain accessed, data connections (to include Internet Service Providers (ISPs), Internet protocol (IP) addresses, (IP) Session data, (IP) Destination Data, bookmarks, data sessions, name of web sites and/or applications accessed), date and time when all web sites, applications, and/or third party applications were accessed and the duration of each web site, application, and/or third party application was accessed, and any other files including all cell site and sector information associated with each connection and/or record associated with the cell number identified as **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** from **August 5, 2025 – November 6, 2025**.

l. Cloud Storage: Content stored in remote storage or 'cloud accounts' associated with the phone number **Unknown phone number – IMSI:**

**310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers**, including but not limited to, contacts, call logs, SMS and MMS messages with associated content including audio, video, and image files, digital images and videos, and files or documents from **August 5, 2025 – November 6, 2025**.

m. Cell Site List(s): List of all cell-sites as of **November/2025** for all state(s) in which the above records used cell locations. Cell site lists to include switch, cell-site number, name, physical address, longitude and latitude, all sectors associated with each cell-site, azimuth, and beam-width of each related sector. If multiple technologies (CDMA, UMTS, GSM, LTE etc.) are referenced in the records, all appropriate corresponding cell site lists will also be provided.

n. Carrier Key related to call detail, text messages, data connections, IP logs, IP Sessions, web site and/or application connections, and cell site information. The "carrier key" is a legend related to the types of responsive data received from the service provider, which contain the record column header labels and their definitions of what each cell value represents in the spreadsheet. Carrier keys are required to decipher what the values represent in these cells, as many of these values may be presented in codes only known to the service provider.

4. I believe that the records described above constitute evidence of the crime(s) of Burglary, contrary to Wis. Stat. §§943.10(1m)(a).

5. I believe that T-Mobile is a provider of an electronic communications service or remote computing service (as defined in Wis. Stat. §§ 968.27(5) and (14g), respectively) because I know from personal and professional experience that T-Mobile provides mobile communication and data service to subscribers in the State of Wisconsin.

6. Your affiant has learned that **Unknown phone number – IMSI: 310260423280089, 310260126406195, 310260555960125, and 310260620760105, along with all other devices owned by the subscribers** have cell phone service through T-Mobile.

7. I am familiar with the process used by T-Mobile to comply with legal process. Based upon my previous experience with T-Mobile, I know that T-Mobile retains records and subscriber information for a time sufficient to allow law enforcement to receive copies of those records through the use of a subpoena/warrant and will comply with a Wisconsin court issued Warrant such as this served by mail and/or fax.

8. I am assigned to investigate a/an Burglary, contrary to Wis. Stat. §§943.10(1m)(a), which occurred September 5, 2025 - November 1, 2025 at W289 N3226 Lost Creek Court, Delafield, Waukesha County, Wisconsin, along with several other locations in both Waukesha and Ozaukee counties.

9. I believe the requested information will confirm: Your affiant previously obtained records from T-Mobile which identified four different International Mobile Subscriber Identifiers (IMSI) which were all detected in the vicinity and timeframe of burglaries which occurred on 10/17/25 in the Town of Delafield (Lost Creek Ct) and on 10/16/25 in the City of Mequon (Hunt Club Ct). These locations are approximately 20 or more miles from one another, and your affiant believes it is likely that the four detected IMSI are associated with the burglary suspect(s). Your affiant believes the requested records will assist with identifying the subscribers to the target IMSI numbers, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and/or financial information. Records of communications and location data may further assist by identifying additional suspects and additional burglaries currently under investigation by law enforcement.

10. The facts tending to establish probable cause for the issuance of a Search warrant are detailed in Attachment A, which is attached hereto and incorporated herein.

11. Within five business days following receipt of the documents, I will prepare and submit to the clerk of courts a Return of this Warrant, accompanied by a written inventory of the documents received.

12. This investigation continues and is ongoing. I believe that secrecy of the request for this Warrant and this Affidavit in support, as well as the issuance of, all orders, returns and other related information concerning the requested Warrant, is appropriate and necessary in order to prevent premature disclosure of the status, progress, or details of the investigation, as reflected in this affidavit and to avoid the disclosure of possible sources of evidence, including sources over which one or more targets may have access or control. Further, based on my training and experience, I am aware, and I believe, that persons who know they are a target of a criminal investigation sometimes attempt to flee to avoid apprehension, tamper with, conceal or destroy evidence that remains within their control, threaten or harm witnesses or otherwise inappropriately influence witnesses. I am aware that the current investigation involves the use of computers or other digital devices, and that the data stored on such devices may be relevant and probative evidence in any subsequent investigation or prosecution. I know from my training and experience that digital data can be recovered from storage devices/media even after long periods of time. However, I also know that digital devices or storage media (hard drives, USB drives, CD's, DVD's, etc.) can be easily concealed, moved, destroyed or damaged and thereby prevent a forensic analysis of the contents of those devices, even if they can be located. For these reasons, secrecy related to this investigation is necessary at this time so that law enforcement can complete the investigation, including seeking search warrants or other means to gain access to such devices/storage media while limiting the likelihood that the relevant data on them will be destroyed or lost.

13. I estimate that further investigation of this matter may take an additional 6 months.

#8643

Detective Ross Seitz

Subscribed and sworn to before me
this 7 day of November, 2025.

Notary Public, State of Wisconsin
My commission ~~is permanent~~ expires 2-20-27

LARA YUHAS
Notary Public
State of Wisconsin

STATE OF WISCONSIN CIRCUIT COURT WAUKESHA COUNTY

IN THE MATTER OF A WARRANT FOR
COMMUNICATIONS/RECORDS OF:

T-Mobile
Attn: Custodian of Records
4 Sylvan Way
Parsippany, NJ 07054

DA CASE: 2025WK007163

RETURN OF WARRANT ISSUED UNDER WIS. STAT. 968.375(3)

I hereby certify that, pursuant to a warrant for communications content and/or other records issued pursuant to Wis. Stats. § 968.375(3) in the above matter on ________________, which authorized the party to which the warrant was directed to comply with the warrant by responding directly to the Waukesha County Sheriff's Department. The following is a summary/inventory of the documents received in response to the warrant:

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

_______________________________________________

The above-described documents remain in the possession of the Waukesha County Sheriff's Department, subject to the disposition of the court. A copy of the warrant and supporting documents are attached hereto. **This "return" and its attachments are filed subject to any existing court orders for sealing of records related to this warrant.**

Dated this _____ day of ___________________________, 20 ____.

_______________________________
Detective Ross Seitz

2025WK007163

## ATTACHMENT A

1. I have been a law enforcement officer since January 3, 2011. I am currently assigned to the Detective Bureau of the Waukesha County Sheriff's Department.

2. I have investigated a variety of crimes, including violent crimes and general property crimes in which cellular data was analyzed to locate evidence of the crime. I have further investigated a variety of crimes including sexual assault, physical abuse/neglect of children, drug distribution, financial crimes, and others by analyzing cellular data.

3. I know it is common practice for most people to rely heavily on the use of cellular telephones for many aspects of their daily lives. People commonly use cellular telephones to send and receive text messages, make voice calls, interact on social media, store contact information, store personal identifying data, maintain calendars or agendas, utilize maps or GPS functions, access the internet, and take photographs and videos.

4. Your affiant is aware that AT&T, T-Mobile, Verizon, and U.S. Cellular are providers of an electronic communications service or remote computing service (as defined in Wis. Stat. §§ 968.27(5) and (14g), respectively) because I know from personal and professional experience that AT&T, T-Mobile, Verizon, and U.S. Cellular, provide mobile communication and data service to subscribers in the State of Wisconsin.

5. Your affiant believes these companies may possess information about the cellular devices on the network including but not limited to:

   a. the telephone number and unique identifiers for each wireless device that communicated with the cell towers, including Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile

Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), and International Mobile Equipment Identities ("IMEI");

b. the source and destination telephone numbers associated with each communication (including the number of the locally served wireless device and the number of the telephone that transmitted a communication to, or to which a communication was transmitted by, the locally served wireless device);

c. the date, time, type, and duration of each communication (starting and ending);

d. for each communication, the "sector(s)" (i.e. the face(s) of the tower(s)) that received a radio signal from the locally served wireless device;

e. the type of the communication transmitted through the tower (such as voice, text or data session); and,

f. all specialized location records including timing advance, real time tool (RTT), location database of record (LocDBoR), or similar which contain additional information not previously referenced above including but not limited to, estimated latitude and longitude (along with confidence level/margin of error) and distance from the tower.

6. Your affiant notes that this warrant does not authorize any additional account information (including basic subscriber or additional location information), and any further information will be requested via additional legal process.

7. Furthermore, your affiant notes that many returns may only have unique account identifiers (such as an IMSI) which are unable to be searched by law enforcement or attributed to an individual user without additional legal process. Additionally, even if a phone number is provided your affiant notes that identifying the actual user of the device may require additional legal process since additional records outside of the initial search parameters are not authorized within this warrant.

8. Affiant knows that the records sought are collected by the cellular telephone company at the cell sites or switches and this application does not request any data stored within the customer's cellular telephone.

a. Furthermore, by this application, affiant is only requesting records pertaining to cellular device registrations and communication detail records and does not seek to intercept or otherwise obtain any part of a customer's cellular communications or conversations (content).

9. Furthermore, by this application, affiant will only analyze the records for this case and any additional information requested will be submitted on a separate search warrant through establishing probable cause based on those devices identified which are consistent with the facts known to investigators.

10. Affiant is aware that service providers often need the GPS coordinates of a location in order to identify the appropriate cell sites and sectors that service the specified area or to query the available business records. During this investigation your affiant was provided the GPS coordinates of the locations described above by using Google Maps (https://www.google.com/maps). The additional locations requested below were also identified for warrant basis through Google Maps.

11. Affiant knows that cellular service providers maintain records of what cell phones connect to cell sites for periods anywhere between 7 days and up to 3 years, depending on the service provider.

12. Affiant does not know which cell phone service provider is providing service to the subject(s) phones and that more than one cell phone service provider may be used by one or more of the subjects. Therefore, the warrant is being directed to all cell phone service providers based on the locations and search parameters referenced above.

13. Affiant has a general understanding of how cellular telephone networks operate. Affiant is aware that cellular service providers strategically place cell sites (towers). The network is engineered to provide a seamless user experience and allow users to travel virtually anywhere and make or receive uninterrupted calls, send or receive text messages, and initiate a data session using their cellular phone. Usually, cell sites are mounted high on a large pole, building, or other structure that provides line of sight with the population below. Cell sites are also typically divided into sectors, which are made up of antennas connected to cellular radio transceivers. Each sector is mounted on the cell site and faces a specific direction to provide maximum cellular coverage for the users in the area. The range of the cell site and sectors depends on many factors to include environmental and geographic factors and whether it is located in a highly populated, urban environment or desolate rural area. Cell site location information (CSLI) does not provide an exact location of a cell phone; the basic call detail record data only provides the physical location of the cell site (latitude and longitude) and a direction (azimuth) the antennas are facing from the cell site.

14. Affiant is aware when a user either initiates or receives a voice call, text message, or a data session (usage event) from their cellular device, the device broadcasts signals to the cell site that routes its communications. These signals include a cellular device's unique identifiers as well as details about the usage event. I am also aware cellular service providers collect and store these usage event details (transaction records) associated with cellular phone numbers during the normal course of business.

15. Usage event records, commonly referred to as call detail records (CDR's), stored by their respective cell phone company, typically contain the following information (with some exceptions based on the specific carrier): Date, time, type of event, duration, phone number initiating the usage event (called, calling). This data is collected even if caller identification is blocked by the calling party, text message transaction data, the International Mobile Equipment Identity (IMEI), the International Mobile Subscriber Identifier (IMSI), IP packet data session logs, and cell site location and sector information at the beginning and ending of each usage event.

16. Affiant believes such information is relevant and material to the ongoing criminal investigation as it may provide investigators with information supporting or refuting the suspect's alibi, and assist with determining other unidentified co-conspirators, and/or show the general geographic location of the target device before, during, and after the commission of the crime. This is basic information and does not provide an exact location of the person's cell phone nor does it identify the other parties.

17. Affiant is aware that obtaining and preserving historical cell phone call detail and specialized location records could also prove to be fruitful, as such records could assist investigators not only with identifying those who may have been in contact with the

victim(s) or potential coconspirators, but may also allow investigators other opportunities, including, but not limited to, confirmation or the disproving of alibis, statements, and other observations.

18. Affiant knows that these records such as those associated with the target phone, are not kept or preserved indefinitely by the cellular service providers and are purged at different intervals. Obtaining and preserving the records at this point in the investigation will ensure the investigators assigned to the case will have them available, and if the case were to go "cold", future investigators will have access to the records that would otherwise likely not be obtainable. Not only could the preserved records assist in proving one's guilt, they could also assist in proving one's innocence.

19. **Subscriber Records** – Affiant is seeking evidence of ownership, use, and identification of the subscriber, customer or owner of the electronic communication information contained in the records retained by the cellular service provider. Affiant is aware, depending on whether the account is post-paid or pre-paid; a consumer must provide information to the cellular service provider. Post-paid accounts are credit based whereby a customer is provided service and then billed after the provision of services. These types of accounts require sufficient identifying information to enable the cellular service provider to make a determination regarding credit worthiness and recourse in the event the consumer defaults on their contractual agreement.

a. The information required by most cellular service providers include the customer's personal identifying information, verified using government issued identification or other means, residential address, alternate contact phone numbers, and electronic mail (email) address(es). Additional

information can include the type of service plan, additional features subscribed to, such as cloud storage and additional phones on the same account, device type and unique identifiers including IMEI and IMSI, method and source of payment information including financial institution and direct billing checking account numbers, credit or debit card numbers, and/or third-party payment processors, and customer service representative account comments and notes.

b. Affiant believes this information is relevant and material to the matter at hand as it serves multiple purposes including identifying the subscriber to the target phone number, providing investigators with additional information and leads including subscriber address, additional phone numbers, and/or email addresses, device identifiers used to correlate any seized phones with the account, previously unidentified phones subscribed to on the same account, and financial information. Affiant knows that ownership and control of a digital device can be placed at issue through a simple denial, "that is not my phone." In affiant's training and experience, some of the best ways to establish ownership and control are by reviewing account information and subscriber records from cellular service providers.

20. **Prepaid "Burner" Phones** - The term "burner phone" is a term commonly used to describe inexpensive cellular telephones that use pre-paid minutes and data and do not require identification or a credit check to activate service. Affiant is aware of the ease of a user being able to purchase and use these phones and how it has challenged law enforcement efforts to identify criminals, terrorist threats, and to locate wanted felons. It is

difficult, sometimes impossible, to determine the identity of a subscriber when the pre-paid providers do not require the identity of the person when obtaining/purchasing a pre-paid cellular phone. From prior training and experience, Affiant knows of cases where pre-paid phones were used by suspects with the intent of concealing their actual identity. This facilitated their continued criminal actions and behavior.

a. Despite the lack of personally identifiable information, pre-paid accounts can still provide investigators with information to identify the user. By examining the call detail and specialized location records of a pre-paid target phone, investigators can examine call and text incoming and outgoing usage events to help identify co-conspirators, associates, friends and family, who could help identify the party utilizing the pre-paid phone. Additionally, pre-paid services typically require some mechanism of payment including pre-paid cards, cash payments at retail establishments, or via an online portal. The financial information may assist investigators with identifying the locations where the pre-paid cards were purchased, the location of the retail establishments used for cash payments, and/or associated online account information and Internet Protocol (IP) addresses.

21. **Call Detail Records** – Affiant is seeking evidence of communication between identified subject(s) and previously unidentified individuals and entities. In affiant's training and experience, associates communicate together via phone calls, text messages, and social media applications via data sessions and these communications most commonly occur on or through cellular devices.

a. In affiant's training and experience, individuals often use digital devices and cellular devices to post messages to others on social networking applications. In affiant's training and experience it is possible for cellular phone users to use a variety of messaging platforms including the cellular SMS (Short Message Service – text messaging) and MMS (Multimedia Message Service – sending text messages with other files such as pictures) technology, as well as third-party applications like Facebook Messenger, WhatsApp, Snapchat, iMessage, and many other applications. Therefore, affiant seeks to search all the communication evidence maintained by the service provider.

b. Affiant is also seeking evidence of association. Affiant knows that establishing the association of coconspirators is important in proving a concert of action between multiple persons. In affiant's training and experience, one of the most effective methods of linking co-conspirators together is by reviewing the call detail records maintained by the cellular service providers. In affiant's training and experience, affiant knows that associates communicate together via voice calls, text messages and third-party applications by means of a data usage event, therefore affiant is seeking the call detail record evidence to demonstrate the associations of the individuals in this case.

22. **Specialized Location Records** – Affiant is aware cellular service providers maintain specialized location records consisting of engineering data. The data are used by the provider's engineers to troubleshoot coverage areas and report on potential dead spots

- all with the intent to oversee and optimize the cellular network. Specialized location records typically contain data for every usage event, to include technology details (e.g. voice, text, and data), resource usage, and call failure information. They can also include data for incomplete calls (e.g. denied calls and set-up failures).

a. These records not only include the basic call detail records, but also an estimation of the target phone's location (latitude and longitude) with a possible accuracy radius, and/or the distance from the cell site at the time of the usage event. Utilizing specialized location records can provide investigators with a much smaller footprint of a target phone's location and could place a target phone within close proximity of a crime scene before, during and after a crime. Each carrier uses their own nomenclature to describe the technology used to obtain this data including NELOS (Network Event Location System) – AT&T, RTT (Round Trip Time/Return Trip Time/Real Time Tool) - Verizon, PCMD (Per Call Measurement Data) – Sprint & U.S. Cellular, and TruCall®, TDOA, Time Distance of Arrival, and MDT GPS – AT&T USA & Metro by AT&T.

b. Affiant believes this information is relevant and material to the investigation as it provides supplemental geo-location information which, while not precise enough to identify a specific house, is accurate enough to provide block-level accuracy, in some cases. Investigators can use this information to correlate existing fact patterns and timelines to confirm or refute prior statements and/or evidence regarding the location of the target device.

23. **Cloud Stored Data** – Affiant is aware cellular service providers offer their customers optional free or paid backup digital storage for some of the content stored on their device. These services are offered to secure and restore their digital information in the event their mobile device is lost or stolen. Because these digital storage services are remote and transparent to the consumer, they are often referred to as 'cloud' storage. Customers can elect to digitally store the contents of their electronic phone book including details of their contacts, names, phone numbers, email addresses, and other data, calendar events, short message service (SMS) messages, commonly referred to as text messages, multimedia message service (MMS) messages, consisting of pictures, videos, and/or audio files with or without accompanying text, call logs of incoming, outgoing, and missed calls, digital images and videos, music and audio files, and electronic files such as documents and spreadsheets.

a. Your affiant has analyzed dozens of phone records in dozens of criminal investigations. Your affiant is aware that understanding a subject's "Pattern of Life" is essential in analyzing phone records. A subject's pattern of life, when referenced in the analysis of phone records, deals with the redundant activities of the user of the phone. For example, regular numbers the phone is in contact with, regular cell towers the phone connects to when making calls at certain times of the day and the frequency in which the phone is used would be examples of an individual's "pattern of life". Your affiant believes that in order to effectively analyze the call records and location information pertaining to an individual's phone records, a long duration of records is required to effectively complete the analysis. This is required in

order to compare the records on the date of the crime with the subject's pattern of life.

24. Your affiant was assigned to conduct follow-up investigation regarding a burglary that occurred on Friday, 10/17/25 between the hours of approximately 7:45 PM – 8:15 PM, at W289 N3226 Lost Creek Ct, Town of Delafield, County of Waukesha, Wisconsin. The information included comes through officers' reports from the Waukesha County Sheriff's Department, who your affiant believes to be truthful, and through your affiant's own investigation. All listed times are in Central Standard Time.

25. On 10/17/25 at about 9:00 PM, the complainant, Victim A, returned home, W289 N3226 Lost Creek Ct, and upon entry found that a rear glass patio door was broken and items were strewn about the residence. Due to Victim A being unaware if an intruder was still on scene, she ran to a neighbor's house, at which time the Waukesha County Sheriff's Department was called to respond and investigate. The investigation is documented by Waukesha County Sheriff's Department Incident Report W25072497.

26. Upon Deputies arrival they secured the residence, finding no one inside. Deputies observed that a suspect or suspects, appeared to have entered the residence through a broken glass patio door on the main level. Shards of glass from the broken door were observed on the interior of the residence. During a walkthrough of the residence, it appeared that the suspect(s) primarily targeted bedrooms on the upper level, specifically the master bedroom, as multiple jewelry cases and drawers were open, along with clothes scattered about. Victim A later confirmed that approximately 100 pieces of jewelry were missing from the empty jewelry cases. It was noted that the suspects appeared to remove a pillowcase from a pillow in the master bedroom, presumably to carry the stolen items.

The scene was photographed, and several surfaces were fingerprinted for possible evidence left by the suspect(s).

27. Victim A provided information that the residence is primarily occupied by her and her husband and their adult son. Victim A advised that her husband was currently out of town. Victim A left the residence earlier that night at about 6:30 PM, to go to dinner with a friend. When Victim A left, her son was still home, however, he reported leaving the house at about 7:15 PM to watch a sporting event at a local restaurant. The residence is equipped with ADT motion sensors, which the family was retroactively able to review. The motion sensors detected regular movement in the house between about 7:48 PM – 8:12 PM, believed to be associated with the suspect(s).

28. A neighborhood canvass was conducted; however, no one was able to clearly identify any suspicious activity that occurred at the Albanese residence during the time of the burglary. It should be noted that the residence is at the end of a cul-de-sac, bordered by woods.

29. The method of this burglary was found to match, or be very similar to, other reported burglaries in both Waukesha County and Ozaukee County – City of Mequon. On Friday, 9/5/25, a burglary occurred in the same Town of Delafield neighborhood detailed above, N32 W29431 Mozart Rd (Location 4). The residence is at the end of a cul-de-sac, bordered by woods. Entry was gained by breaking a glass rear patio door. A pillowcase was also removed, and several items of jewelry were taken from the master bedroom. The suspects are believed to have been scared away by the returning homeowners, and some items of stolen jewelry were located through a wooded path at the rear of the residence. This case was assigned to Waukesha County Sheriff's Detective Jeremy Stilling, Incident

Report W25062520.

30. On Friday, 10/10/25, the Mequon Police Department investigated a burglary at 2401 W. Range Line Terrace, City of Mequon (Location 3). The residence is on a cul-de-sac, bordering woods. Entry was made through a broken window outside of a second-floor balcony. The suspect(s) targeted the master bedroom/master bathroom, and a large amount of jewelry was stolen. As the homeowners had recently stripped the beds of linen, they were unsure if a pillowcase was missing. This investigation is documented by Incident Report 25-027167, assigned to Detective Charles O'Connell.

31. On Thursday, 10/16/25, the Mequon Police Department investigated a burglary at 10139 Hunt Club Ct, City of Mequon (Location 2). The residence is on a cul-de-sac, bordering woods. The suspect(s) entered the residence through a broken glass patio door. Items stolen included jewelry, cash, and silver coins. A police K-9 track led investigating officers to believe that the suspect(s) utilized the woods to approach and exit the residence. The homeowners confirmed that a pillowcase was also removed from the bed and missing, located in the same room where jewelry was taken. This investigation is documented by Incident Report 25-027665, assigned to Detective Charles O'Connell.

32. On 10/31/25, your affiant was contacted by Det. O'Connell who shared a video obtained via a trail camera from a resident at 13700 Hillside Drive, City of Mequon. The video, taken on Thursday, 10/30/25 at about 7:30 PM, depicted three individuals walking through the woods near the Hillside Drive residence. The three individuals all appeared to be wearing gloves or masks, carrying backpacks. As the individuals approached the trail camera, they immediately turned around and went the opposite way. The resident who owned the trail camera received a live time notification of the activity.

Law enforcement responded to the scene to establish a perimeter and locate the suspects; however, the three individuals were not found.

33. On 11/4/25, your affiant was contacted by Investigator Daniel Hughes, Washington County Sheriff's Office, who reported a similar burglary which occurred on 11/1/25 at 3106 Wedgewood Dr, Colgate. This residence is also located on a cul-de-sac, surrounded by woods. Investigator Huges indicated that between approximately 7:00 PM – 10:00 PM, unknown suspects entered the residence by breaking a rear bedroom window. The suspects targeted cash and jewelry, leaving behind other valuables such as electronics.

34. Your affiant has regularly communicated with the investigators assigned to these burglaries. During our communications, we have identified many commonalities between the burglaries, including some details regarding the suspect(s) methods, which are being withheld to preserve the integrity of the ongoing investigations. At this time, your affiant believes it is likely all six burglaries were committed by the same suspect(s).

35. Through additional research and communication with other law enforcement agencies, your affiant has learned that these burglaries are consistent with many being conducted nationwide by suspects associated with South American Theft Groups (SATG). These suspects have been known to target expensive homes, often containing high value items such as jewelry. Entry to the home is often made through a glass door or window. They are known to conduct extensive surveillance of the targeted residences and their occupants, including the use of various techniques to avoid detection by home security systems.

36. Your affiant previously (10/28/25) served warrants on T-Mobile, AT&T, U.S. Cellular, and Verizon for Tower Dump / Areas Search records which would identify

phone numbers or devices which were in the vicinity of several of the reported burglaries. On 11/5/25, your affiant received records from T-Mobile, which were subsequently provided to Waukesha Sheriff's Detective David Schoeder, assigned to the Computer Forensics Lab, for review.

37. Detective Schroeder advised that after reviewing the records from T-Mobile, there were four International Mobile Subscriber Identifiers (IMSI), which were suspects in this investigation. The four suspect IMSI's were identified as: **310260423280089**, **310260126406195**, **310260555960125**, and **310260620760105**. Detective Schroeder based this off the fact these four IMSI's were each in the area of Delafield during the investigative timeframe and in the area of Mequon during the investigative timeframe. More specifically, he identified the following:

a. IMSI **310260423280089** was in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:44 PM to 7:32 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 8:21 PM to 8:22 PM.

b. IMSI **310260126406195** is in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:42 PM to 7:31 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 7:56 PM to 8:21 PM.

c. IMSI **310260555960125** is in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:43 PM

to 7:25 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 7:49 PM to 8:21 PM.

d. IMSI **310260620760105** is in the general area of the victim residence on Hunt Club Ct in Mequon on October 16, 2025 from approximately 6:42 PM to 6:54 PM. This IMSI is also in the general area of the victim residence on Lost Creek Court on October 17, 2025 from approximately 7:30 PM to 8:21 PM.

38. Based on the distance between Lost Creek Ct – Town of Delafield, and Hunt Club Cir – City of Mequon, your affiant believes it is likely that the same four IMSI being detected near the burglaries, on different days but times consistent with both burglaries, would be consistent with the unknown suspect(s). Your affiant now requests a warrant to obtain additional records from T-Mobile regarding the accounts associated with the four identified IMSI. The requested records encompass a timeframe to account for the first reported similar burglary on 9/5/25, up to, the last reported similar burglary on 11/1/25. Your affiant also requests the timeframe of the records request includes approximately one month prior to the 9/5/25 burglary, as this would document any activities or communications associated with the planning the burglaries.

39. Your affiant believes the requested T-Mobile records are imperative to identifying the suspect(s) and gathering data as to their involvement in the underlying crime being investigated, Burglary, in violation of Wisconsin Statutes section § 943.10(1m)(a).